SERVICE AUTO SUPPLY CO. OF PUERTO RICO, Plaintiff-Appellee,

v.

HARTE & COMPANY, INC., Defendant-Appellant.

No. 75–1145.

United States Court of Appeals, First Circuit.

Argued Feb. 4, 1976.

Decided April 14, 1976.

Harvey Reich, New York City, with whom John J. Sobolewski and Aranow, Brodsky, Bohlinger, Benetar & Einhorn, New York City, were on brief, for defendant-appellant.

Harry E. Woods, Santurce, P. R., with whom Philip E. Roberts and Baker & Woods, Santurce, P. R., were on brief, for plaintiff-appellee.

** Of the Eighth Circuit, sitting by designation.

Before COFFIN, Chief Judge, MATTHES ** and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

This is an appeal by defendant Harte & Company, Inc. from a judgment in the amount of $86,623.30, following a jury verdict as to damages in a breach of contract action. Plaintiff-appellee, Service Auto Supply Co. of Puerto Rico, was, at the time of the events leading to this suit, known as Cle-Ware Industries, Inc. of Puerto Rico (Cle-Ware). Cle-Ware was a wholesaler of automotive accessories and Harte a New York manufacturer of plastic products, including car mats for the front and rear sections of automobiles. The contract, for alleged breach of which Cle-Ware brought suit, was for the delivery of car mats ordered in three purchase orders in the spring of 1969. The total price to Cle-Ware was $41,823.60, the recovery of which Harte sought by counterclaim.

The case was tried to a jury. Three witnesses testified for plaintiff Cle-Ware; the sole defense witness was Harte's president, Strauss. Various letters and other documents were introduced into evidence. At the close of all the evidence, the court granted plaintiff's motion for a directed verdict as to liability and its motion to dismiss defendant's counterclaim except for $8,000, the amount received by plaintiff in 1972 when it sold the goods to a third party. The critical issues are whether the court erred in directing the verdict as to liability and in so dismissing the counterclaim; and whether the jury's verdict as to damages was supported by the evidence.

The most troublesome issue lies in the direction of the verdict for plaintiff on liability.[1] While such a direction in favor of

---

1. Plaintiff-appellee argues that appellant is barred from raising the question of sufficiency of the evidence, it not having itself moved for a directed verdict, citing our cases requiring such from a defendant who seeks to challenge the sufficiency of evidence supporting plaintiff's case. *Gillentine v. McKeand*, 426 F.2d 717 (1st Cir. 1970) and *Bayamon Thom McAn, Inc. v. Miranda*, 409 F.2d 968 (1st Cir. 1969). But defendant here objected and later moved for a new trial on the ground that the verdict was wrongly directed. It does not challenge the sufficiency of plaintiff's evidence; rather it challenges the determination, as a matter of law, that its evidence was insufficient to go to

the party having the burden of proof is rare, it is permitted where that party "has established his case by testimony that the jury is not at liberty to disbelieve." [2] But the standard of proof to be met is a strict one. The Supreme Court in *Brady v. Southern Ry. Co.*, 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239, 243 (1943), has defined the evidence meriting such a sudden death result as "such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict." In *Federal Insurance Co. v. Summers*, 403 F.2d 971, 975–76 (1968), we said:

> "It is a rare case where the proponent is entitled to a directed verdict, *Roche v. New Hampshire Nat'l Bank*, 192 F.2d 203 (1st Cir. 1951), and indeed, the only case, where a directed verdict would be warranted would be where the proponent's . . . evidence establishing a *prima facie* case is uncontradicted and unimpeached. *See, e. g., Chesapeake & O. R. Co. v. Martin*, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983 (1931); *National Dynamics Corp. v. Petersen Publishing Co.*, 185 F.Supp. 573 (S.D.N.Y.1960). *See generally* 5 Moore's Federal Practice 2319 (2d ed. 1968). Even where the proponent's evidence is uncontradicted, a directed verdict would not be proper if the evidence gives rise to conflicting inferences, *see, e. g., Readnour v. Commercial Standard Ins. Co.*, 253 F.2d 907 (10th Cir. 1958), or where the case is totally dependent on the credibility of a witness. *See, e. g., Powers v. Continental Cas. Co.*, 301 F.2d 386 (8th Cir. 1962); *Polhemus v. Water Island, Inc.*, 252 F.2d 924 (3rd Cir. 1958)."

■ In ordinary cases, such as this one, where the issues are factual, oral testimony is dominant, and the testimony from each side is likely to be given by witnesses who are committed in their views to one party or the other, whether or not legally "interested", the making of a motion for directed verdict by a party having the burden is a long shot gamble. In the generality of cases, it saves perhaps a few hours of jury time but nothing else. Affirmance requires the most detailed combing of the record and exposition by the appellate court. Reversal means an entire new trial and possibly another appeal. Perhaps its only merit is that if made and refused, the motion preserves, for a plaintiff, the issue of sufficiency of defendant's evidence in the event of a verdict for defendant. While counsel may feel obligated to make the motion, we advise caution on the part of the court.

■ The plaintiff's evidence consisted of the testimony of Michaels, who had been Harte's exclusive sales representative in Puerto Rico; [3] of Kaplan, the former president of Cle-Ware; and of Maldonado, Cle-Ware's former general manager. Their testimony can be summarized as follows. In late 1968 Cle-Ware's predecessor, Economy Auto Supply Co., had purchased some car mats from Harte, had complained about them, and Harte had arranged a transfer of the mats to another buyer, indemnifying Cle-Ware against any loss. Other companies had had similar complaints. On the very date when written evidence of the indemnification undertaking was given Cle-Ware, March 31, 1969,[4] Cle-Ware entered into a series of new orders, the first two carrying the notations "First quality merchandise only. Shipment will not be accepted with more than 2% 'seconds' or defectives. All new open front cartons."

---

the jury. It clearly has preserved its right to make the challenge.

2. 9 Wright and Miller, Federal Practice and Procedure, 591. *See* authorities gathered in § 2535.

3. Harte has argued that Michaels' statements and correspondence should not have been admitted, since no general agency relationship was established. But Michaels took the stand and testified to the substance of his correspondence. Moreover, as is the case with many other points raised on appeal, error if any was not preserved; the testimony came in without objection.

4. A written undertaking of indemnity, signed by Senie, Harte's sales manager, was in evidence. Senie's whereabouts was unknown by either party at the time of trial.

The first shipment arrived in Puerto Rico on June 4. Shortly thereafter it was inspected by Michaels, Kaplan, and Maldonado. They testified that they opened at random approximately one fourth of the cartons in the shipment, and found that the mats had been shipped in smaller cartons without an open end front (for use on display shelves), were wrinkled or curled in cartons too small to contain them flat, were of varying shades within each set of two, had holes or bubbles, and some were lacking manufacturer's labels.

Within a few days of this first shipment, Kaplan and Michaels visited Harte's New York headquarters, seeing Senie, the sales manager, and Shedlin, the Vice President. Kaplan complained about the one shipment that had been made. The testimony of Michaels and Kaplan varied in detail about what was said at this meeting, but both agreed that further decision was held in abeyance until Senie went to Puerto Rico to look into the problem. Kaplan said that after this meeting, on the same day, he saw Strauss, and merely presented his problem to him, knowing that others were closer to the situation.

Senie wrote Michaels on June 17 that he would be coming to Puerto Rico within a few days. He came, viewed at least the first two shipments, offered Cle-Ware a rebate of $2.25 a set (each set carrying a price to Cle-Ware of from $3.85 to $6.65), and, this being refused by Kaplan, said he would go back to Harte and see what further action could be taken. Subsequently, Kaplan and Michaels inspected the third and fourth shipments (about June 19 and July 3), sampling about 25 per cent of the cartons and finding the same predominance of defective mats and cartons.

This, apparently, was the end of attempted settlement. On July 10, Senie wrote Michaels a mea culpa letter, saying both had been guilty of poor planning, in effect having looked on Puerto Rico as a dumping ground, and that, henceforth, only first quality goods should be programmed. On July 11, Kaplan cabled Harte, insisting on removal of the goods and payment of the excise taxes paid and damages suffered by Cle-Ware. Strauss called Kaplan at about this time and offered to take back the goods, if Cle-Ware would abandon any claim for damages. Failing that, Strauss (according to Kaplan) would flood Puerto Rico with low price car mats. Kaplan wrote Strauss on July 14 that Senie had not produced on his offer to increase the discount or remove the merchandise in late June; he warned of the continuation of large accumulating expenses and demanded immediate action. The suit was filed August 1.[5]

Harte's witness—its President, Strauss—testified that he was aware of only one prior complaint concerning its products in Puerto Rico. He did not know of the indemnity arrangement with Cle-Ware in early 1969. The first time he knew of Cle-Ware's current complaint was on June 13, 1969, when Kaplan phoned him while in New York. Strauss said that Kaplan, having been unable to see Senie and Shedlin, wanted to see him. Kaplan came into his office, samples under each arm, and complaining about the cartons not revealing the product within, about colors of individual sets not matching, and about the mats being curled in boxes which were too small. Strauss offered to stop the fifth shipment, which was yet at the factory, and to take back the entire order. He offered a car to Kaplan to go to the factory and see the goods for himself. But Kaplan did not want to cancel the order. Things, he said, were "not that serious". He preferred to leave the order standing and to rely on the results of Senie's visit to Puerto Rico.

After the June visit of Kaplan, Strauss did nothing until July 11, 1969, when he called Kaplan, offering to take back all of the car mats, or such part as Kaplan could not use. Strauss said that Kaplan refused, saying that he would never let Harte dis-

---

5. At least from this time on, there was no question as to Cle-Ware's rejection of the goods.

tribute any of the mats in Puerto Rico. On July 24, Strauss wrote Kaplan, saying that, without conceding any merit to Cle-Ware's complaints, if Cle-Ware was not willing to let Harte pick up its merchandise and pay any duty thereon, it would have to take all necessary action.

The remaining part of Strauss' testimony had to do with the value of scrap plastic material in 1972, when plaintiff sold the mats it had received in the four shipments (the fifth was never picked up by Cle-Ware) for $8,000. Strauss said that the recycling or remelting value would yield a total price in 1972 of approximately $21,000.

This is the distillation of several days of trial. The focus is whether Strauss, by his testimony or letter of July 24, created an issue of fact for the jury. A minor issue raised by his testimony might be said to be whether or not others had registered complaints with Harte prior to the events at issue here. Strauss said he was aware of only one. But documentary evidence from his own official, Senie, evidenced a different disposal of seconds and an indemnity arrangement with Cle-Ware. This was positive proof that he did not know the complaint picture in significant detail.

The major thrust of Strauss' testimony was that, as of June 13, before delivery of the second, third, and fourth shipments, Kaplan was not so disturbed as to cancel the entire deal. This is a significant piece of evidence. Our question is whether the jury could reasonably have concluded from this that the shipments really were not bad enough to reject and that Cle-Ware's later determination not only to reject the shipments but claim damages was a belated move to cut obligations. Had the plaintiff's evidence stopped as of this time, a jury issue would clearly have been made.

But Kaplan and Cle-Ware never claimed that they had given up hope by the time of the first shipment. Cle-Ware had arrangements to fill orders from retailers based on lists of products it had held out as available. It could not easily or quickly obtain another source of supply. The troubles deepened as the succeeding shipments arrived. When Senie made his mid-June trouble-shooting trip to Puerto Rico, and looked at the first two shipments, he (according to all three of plaintiff's witnesses) agreed that the merchandise was poor, and made the very substantial offer to allow Cle-Ware a credit of $2.25 a set. Strauss said he knew of this offer—an offer which implicitly recognized that there were more than the two per cent of defectives in the shipments, which the order set as the ceiling. Moreover, Strauss himself acknowledged that the cartons were not the "open end" type that had been ordered, and that mats allowed to remain curled up for two to four weeks would not regain their former shape. For a wholesaler dealing with retailers who required a display carton and for whom a delay of several weeks in transit was inevitable, these defects were not minor.

Finally there is the fact of Strauss' eleventh hour offer, evidenced by his letter as well as his testimony, to take back all the mats and pay the excise taxes. Construing this evidence most favorably for defendant, it was an attempt by Harte to salvage Cle-Ware's good will, rather than an admission of defective goods. But this is not positive evidence of the satisfactory condition of the goods.

The fact is that, apart from Strauss' testimony as to six samples from the first shipment, Harte produced no witnesses as to the condition of the goods as delivered. Senie was not available. Its key official, Shedlin, to whom Senie reported, did not testify. During the two and one half years which elapsed between the filing of suit and Cle-Ware's sale of the mats for $8,000, no attempt at inspection or production was made. Strauss testified only as to an early conversation and a last minute offer. It is true that much of plaintiff's evidence was in the form of testimony given by witnesses who were sympathetic to Cle-Ware, although none were presently affiliated with it. But not only did Strauss' testimony fail to contradict plaintiff's witnesses as to the condition of the goods on delivery; it corroborated it as to the packaging of the mats in closed cartons, so small as to bring about

28

curling, as to Senie's offer of a credit, and as to Strauss' offer to take the entire shipment back and pay for the excise taxes. We conclude, though not without travail and antipathy for this kind of analysis, that a jury could not have found for the defendant on the issue of liability. The directed verdict on this issue may stand.

Not so with the dismissal of the counterclaim except as to the $8,000 paid by Kaplan to Cle-Ware in 1972 for the mats which had been delivered. Strauss' testimony that, in 1972, the scrap value was at least $21,000 posed a jury issue. The duty to mitigate damages must be subjected to a reasonable value test. The case must be remanded for a finding as to the reasonable value of the mats disposed of by Cle-Ware.

■ Appellant attacks the jury verdict as not being supported by the evidence. It is true that the evidence as to lost profits, as to storage and labor, and as to good will was not documented or detailed. But what evidence there was went to the jury without objection and proved persuasive. We see no egregious error of law in instructing the jury. No objections were made to the instructions. The jury returned a verdict substantially less than was asked. We cannot, in the hindsight which is vouchsafed to us, say that what the jury did profoundly shocks our sense of justice.

Appellant sees fit to challenge the closing argument of appellee's counsel. It does indeed appear, in cold print, somewhat Gothic and extreme. But there was no call on the court to halt the excess of verbal imagery or invocation to the poets. We cannot fault the court. And perhaps opposing counsel felt that the effort would trip on its own ebullience. This kind of play must normally be left to counsel and the trial court, at least in a civil case.

■ As for a claim that the appropriate statute of limitations required plaintiff to bring an action within four days of receipt of the merchandise, 10 L.P.R.A. § 1712, we find persuasive the argument of appellee that another section, § 1703, is applicable when sale is made by sample, as here.

*Judgment vacated. Remanded for trial as to amount by which damages are mitigated. No costs.*