Lewis MANN, D.O., Plaintiff, Appellant,

v.

Joseph E. CANNON, M.D., et al.,
Defendants, Appellees.

Lewis MANN, D.O., Plaintiff, Appellee,

v.

Joseph E. CANNON, M.D., et al.,
Defendants, Appellees.

Appeal of Leo GRACIK, Leo Grand-
champ and Charles Hachadorian,
Defendants.

Nos. 83–1255, 83–1256.

United States Court of Appeals,
First Circuit.

Argued Nov. 9, 1983.

Decided March 29, 1984.

court ruled, without appeal, that the statute of limitations barred any recovery based on the officers' conduct prior to Monday, April 19, 1976. Claims of illegal search and seizure and false arrest under section 1983, and related state law claims—all based on conduct on April 19—were sent to the jury. The jury found for the defendants on all counts except false arrest under Rhode Island law. On the latter, it awarded punitive damages of $7,500 against each of three state health officers. Both Mann and the three officers have appealed from the judgment.[1]

Keven A. McKenna, Providence, R.I., with whom Bruce Hodge, and McKenna, Greenwood & Feinstein, Providence, R.I., were on brief, for Lewis Mann, D.O.

Faith A. LaSalle, Sp. Asst. Atty. Gen., Providence, R.I., with whom Dennis J. Roberts II, Atty. Gen., Providence, R.I., was on brief, for Joseph E. Cannon, M.D., et al., Leo Gracik, Leo Grandchamp and Charles Hachadorian.

Before CAMPBELL, Chief Judge, ROSENN,* Senior Circuit Judge, and BREYER, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

In April of 1976, local police and Rhode Island health officers entered a house located in Warwick, Rhode Island, belonging to the plaintiff-appellant, Dr. Lewis Mann, D.O., where they seized various items and eventually arrested Mann on a state drug charge. Asserting that their conduct violated his fourth, fifth and fourteenth amendment rights, Mann brought a civil action in the district court under both 42 U.S.C. § 1983 and state law. The district

## I. SEARCH AND SEIZURE CLAIM UNDER SECTION 1983

Mann argues that the warrantless "clean-up" of his house on April 19, 1976, was so plainly in violation of the fourth amendment that the district court erred in not ordering the entry of judgment n.o.v. on his section 1983 search and seizure claim seeking damages against the participating defendants.

For Mann to prevail on this argument he must establish that evidence "the jury was not at liberty to disbelieve," C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2535 at 591 (1971), *quoted in Service Auto Supply Co. v. Harte & Co.*, 533 F.2d 23, 25 (1st Cir.1976), "could lead reasonable men to but one conclusion." *de Mars v. Equitable Life Assurance Society*, 610 F.2d 55, 57 (1st Cir.1979). And he must overcome the natural reluctance of courts to order a directed verdict for a party having the burden of proof. *Service Auto Supply Co.*, 533 F.2d at 25. *See Federal Insurance Co. v. Summers*, 403 F.2d 971, 975–76 (1st Cir.1968) (directed verdicts improper even on uncontradicted evidence if conflicting inferences possible or case dependent on witness credibility).[2]

---

* Of the Third Circuit, sitting by designation.

1. Because of our resolution of the case, we do not reach Mann's appeal from the district court's refusal to award an attorney's fee under 42 U.S.C. § 1988.

2. In denying judgment n.o.v., the district court stated,

the Court can state generally that it appeared to the Court, and the Court believes it safe to say, that it appeared to the jury that the evidence presented by the plaintiff, most particularly the plaintiff's own testimony, was lacking in those attributes which would attach credit worthiness to it .... [P]laintiff ...

*See also Hawkins v. Hall,* 644 F.2d 914, 917 n. 2 (1st Cir.1981) (where there are many nuances and facts and reasonable people could differ over whether constitutional standards were transgressed, traditional concepts of role of jury make it proper that the final judgment be left to the jury). Having requested a jury trial, plaintiff may not easily overturn the jury's refusal to award him monetary relief.

In summarizing the facts, we do so in a version favorable to defendants, as the jurors were likewise entitled to find.

A. *Facts*

In November 1974, almost two years before the events in question, plaintiff gave up his Rhode Island osteopathy practice and moved to the state of New Hampshire. Although the evidence before the jury indicated that plaintiff was required by Rhode Island law to register at each place where, as a practitioner, he stored controlled substances, Mann moved the drugs and supplies from his practice to a house at 59 Alden Avenue, Warwick, which had until then served as his residence. He did not bother to register the new location with the Rhode Island Department of Health.

From the appalling later state of the house and other evidence, the jury could infer that Mann rarely, if ever, returned to the house and that the precautions he allegedly installed, such as an alarm and spotlight system, were vastly overstated, if they existed at all. By the time of the events in question, it could infer, the electricity had long since been shut off, rendering such devices, if any, useless. Given especially the presence of the drugs, the jury could view Mann's conduct as not only irresponsible, but as the principal cause of the public nuisance which developed.

By April 1976, when the building came to the attention of local and state authorities, it had become an attraction for vandals, including local school children. The jury could infer that this condition had existed for a considerable period of time. The

house was in utter disarray. Its windows were broken. Its doors were broken and open to the public. The boxes of drugs and supplies were torn apart, their contents distributed throughout the house. Trash was piled at places to a depth of three to five feet, burying furniture and fixtures from sight. The trash included crumpled, soiled paper, rotting candy bars and fruit, toilet tissue permeated with human body fluids, exposed hypodermic needles, and up to 77,000 doses of controlled, outdated and misbranded drugs. There were rats in the bathroom. There was a stench. In that condition, the jury could conclude that the house was a hazard to all who entered, not merely because of the drugs which could be obtained there, but also because of the variety of diseases—including hepatitis from a needle wound—which might be contracted there.

Warwick authorities first learned that the Alden Avenue property had attracted intruders late in the evening of April 13, 1976, when they received a report that three male juveniles had been seen breaking in. Officers were dispatched to investigate. One officer entered the house through a basement window, another through the back door. They found the house to be unoccupied and vandalized, and to contain large quantities of physician sample drugs. Continuing their investigation on April 14, the officers learned that the house belonged to a Dr. Mann, who resided at an unknown address in New Hampshire. Beginning the following day, April 15, the police department began efforts to reach Mann.

Events of April 15 dramatically changed the department's view of the break-in and the condition of the Alden Avenue property. During the course of the day several school girls delivered to authorities at the junior high school a bag of physician sample drugs which they found near the school. The drugs were like those observed at the house. Officers interviewed students at the school, including the girls, and concluded that the house might present

was almost pathetically eager to make self-serving statements....

a serious danger to the community as it had attracted not only vandals but also neighborhood children who apparently were using it as a source of drugs. The police concluded that they lacked the expertise to ascertain accurately the extent of the danger or to deal with it safely.

Thus on Friday, April 16, at the start of the Easter weekend, Warwick police captain John Mulhearn contacted Dr. Joseph Cannon, director of the Rhode Island Department of Health, to request assistance. Cannon's staff reached senior narcotics inspector Leo Gracik by car radio within minutes. Gracik went directly to the house, where he was met by a Warwick policeman. The two then entered the house to conduct an inspection. When he emerged, Gracik promptly called Charles Hachadorian, deputy drug control administrator in the state Department of Health, to report that in his view the house presented a serious and immediate hazard to the public.

Although the Department of Health was then operating with only a skeleton crew at the start of a holiday weekend, Gracik requested help to begin a clean-up operation immediately. He was soon joined by John Campoli, chief of the pharmacy section of the Department of Health. Together they reentered the house to sort through the refuse, separating the owner's personal belongings from drugs, needles and other dangerous materials. They were aided by several Warwick policemen during the course of the afternoon.

The police department finally reached Dr. Mann around 3:00 p.m. on Friday, April 16. He was informed of the break-in and vandalism, and told that the Department of Health was conducting the clean-up and sought his participation. Mann drove to Rhode Island after stopping for a meal. When he arrived at Alden Avenue around 5:30 p.m., the clean-up crew had gathered outside the house for a rest. There was a garbage truck pulled up near the building.

Mann was at first angry. He objected to the officers' entry into the house to sort through his belongings. He offered to remove the drugs himself. When the officers pressed for permission to reenter, he demanded that they provide him with a warrant or some other "legal document." The officers then suggested that he consult an attorney. Mann agreed. At 7:15 p.m. Mann's attorney arrived, spoke briefly with the officers, inspected the house and consulted with Mann, urging him to consent to the resumption of the clean-up. Thereafter, the jury could conclude, Dr. Mann's irritation gave way to an attitude of cooperation.

Negotiations took place between Gracik and Officer DePalma of the Warwick Police Department, on the one hand, and Mann and his attorney on the other. Mann's attorney indicated that the doctor wished to be present "so that he could observe the drugs being removed," according to DePalma. The officers agreed and called for emergency lighting so that the job might possibly be completed that evening. DePalma testified that

> Dr. Mann said that he could not stay there for the weekend, or for any length of time, he had to go back to New Hampshire. This was discussed with his attorney again, and he said, "Can't we wait until Monday, I will come back Monday, I want to be present to ensure that none of my personal belongings are removed." We suggested at that point that the only way that that could happen is that the house be guarded for the weekend. He said, "Well, that's okay, I'll pay for a guard," he said, "I don't care what it costs, but I want to be here, and I can't be here for the weekend." So we agreed
> . . . .

The jury could find that an understanding had been reached between Mann and the defendants that the clean-up would proceed on Monday, April 19, with Mann's participation. Dr. Mann gave DePalma and Gracik $160 as an advance payment for the guards. He helped DePalma board up the house. Thereafter the officers refrained from reentering the house. Mann did not object when his reentry was barred by Captain Mulhearn.

On Monday, April 19, Dr. Mann returned to Rhode Island, going to the Department of Health to attempt to renew his license to practice osteopathy in that state. There he spoke with Hachadorian and Anthony Del-Guidice, legal counsel of the Department of Health, who explained that they had been issued a "compliance order" authorizing the clean-up of the garbage and drugs.[3] Mann made no objection.

By about 12:15 the parties had regathered at Alden Avenue. The order was read to Mann. Again Mann voiced no objection to the resumption of the work, asking only for a brief delay to permit his attorney to arrive. When the attorney did not come, the work began. During the next 15 minutes until his arrest, Mann participated in the clean-up, asking that various items be saved from the garbage truck. The jury could conclude that the officers complied with each request.

### B. *Analysis of Search and Seizure Issues*

The fourth amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause ...." U.S. Const. amend. IV. Courts have consistently followed "one governing principle" in interpreting this mandate: "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930 (1967).

The district court recognized these principles both in its jury instructions and its later analysis when denying plaintiff's mo-

tion for judgment n.o.v. In its charge to the jury the court explained that defendants had to justify their failure to obtain a search warrant before entering Mann's house. Ordinarily, it said, the absence of a warrant is "justified only where either the owner of the property has consented to the search or where there are exigent or emergency circumstances." In this case, it instructed, "In order to conclude that the defendants were [so] justified ... you must find that this emergency exception was existing and applicable at the time of the search."[4] In assessing this issue the jury was instructed to consider the conditions present on April 16, the lapse of time between the 16th and 19th, and "the intervening dialogue between plaintiff and certain of the defendants ...."

Later, in denying plaintiff's motion for judgment notwithstanding the verdict, the court explained,

> There is no question ... the state defendants entered upon property owned and possessed by the plaintiff without having secured a warrant and I think all of us with the benefit of that hindsight which is always twenty-twenty would argue that the problems presented might have been easier had a warrant been obtained, but that's certainly not the end of the matter ....

The court concluded that the jury could have found "that exigent circumstances did indeed exist so as to justify the [warrantless] search and seizure" on Monday, April 19. The court was troubled by "what appears facially to be an inordinate lapse of time" between Mann's first appearance on the premises on the preceding Friday, in the late afternoon, and the event on Monday, but noted that,

> [W]hen everyone left the property that [Friday] night they did so with the state

---

3. The "compliance order" served two functions. It declared the "conditions" at the Alden Avenue property to "constitute a present danger to the [public] health, welfare, and safety ...." Next it "order[ed] that all drugs, ... drug apparatus and paraphernalia, ... garbage and waste at the premises be removed ... immediately by the Division of Drug Control of the Department of Health ...."

4. Because of the district court's now uncontested ruling that plaintiff was barred by the statute of limitations from recovering damages for anything occurring before April 19, the events occurring before then are relevant only insofar as they bear on the legality of what took place on Monday, April 19. This is essentially what the district judge instructed the jury.

defendants having reason to believe that it was entirely likely that come the next business day, Monday morning, the 19th, that the plaintiff would consent to a search of his property with respect to the extremely dangerous sort of contraband which is here involved. Indeed, on Friday evening, the 16th, the evidence will show that the plaintiff's own lawyer had advised him so to consent.

■ We think the jury could find that the circumstances faced by the officers on April 16 presented "an exigency of sufficient proportions" to render a warrant unnecessary at that time. *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978).[5] We also think, given especially Mann's words and conduct evincing a willingness to cooperate in the cleanup and the authorities' justified reliance thereon, that the justification which had originally permitted the warrantless entry could be found to continue to shield the defendants' activities on Monday, April 19.

The constitutionality of warrantless entries into private premises for health and safety reasons has most recently been discussed by a divided Supreme Court in *Michigan v. Clifford,* —— U.S. ——, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984), dealing with a post-fire search of an occupied private dwelling. The plurality opinion, written by Justice Powell, focuses on three factors in evaluating such entries:

> [W]hether there are legitimate privacy interests in the fire-damaged property that are protected by the Fourth Amendment; whether exigent circumstances justify the government intrusion regardless of any reasonable expectations of privacy; and whether the object of the search is to determine the cause of the fire or to gather evidence of criminal activity.

*Id.* at ——, 104 S.Ct. at 646.

Here, as respects the entries before April 19, the jury could conclude that each of these considerations was satisfied. First, it could find that Mann's privacy interests in the Alden Avenue structure were minimal. Used without adequate precaution by its absentee owner as a place to store dangerous drugs, not as a residence, the house had become open to the public, vandalized, uninhabitable, and from appearances virtually abandoned. Despite repeated efforts to reach the owner, he was still unlocated when the health officers arrived on April 16, the day before the Easter weekend. "[P]rivacy interests are especially strong in private residences and offices" and significant, although somewhat "diminished ... in commercial premises," *id.* at —— n. 7, 104 S.Ct. at 648 n. 7, but here, the jury could conclude, Mann's house had in large measure lost its character not only as a residence but as a privately occupied structure. The jury could infer that a variety of intruders had gone in and out over an extended time period without reasonable efforts by the owner to deny them access.

The jury could reason that Mann's privacy interests in the property were diminished for another reason as well. On becoming an osteopath Mann had knowingly joined a highly regulated profession. In establishing a practice in Rhode Island he had voluntarily submitted to the state's regulatory scheme. He became licensed personally and registered his original office as a place to store drugs, thus securing a privilege denied to most people. *See, e.g., United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). Thereafter, Mann permitted his license to practice osteopathy to lapse and moved the drugs from a registered to an unregistered and insecure location. The jury could conclude that having taken upon himself the obligation to keep these substances in a safe manner, Mann had little to complain about when the health officers entered the property, then wide open and in the extreme of

---

5. Mann does not complain concerning the police entry without warrant on April 13, following the reported break-in. *See United States v. Estese,* 479 F.2d 1273 (6th Cir.1973); *Common-*wealth v. Fiore, 9 Mass.App.Ct. 618, 403 N.E.2d 953, 954–55, *cert. denied,* 449 U.S. 938, 101 S.Ct. 336, 66 L.Ed.2d 160 (1980); W. LaFave, *Search & Seizure* § 6.6(b) (1978).

disarray, to perform Mann's own duties. Mann's belated effort to renew his license on the morning of April 19 and his attempt here to characterize his house as a "warehouse" under the state drug laws support this analysis. *See infra* text accompanying note 10.[6]

As to the second factor, the existence of an emergency, the jury was entitled to weigh the evidence of public danger against "the controlling standard of reasonableness." *Camara v. Municipal Court*, 387 U.S. at 539, 87 S.Ct. at 1736. The fourth amendment does not

> foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations. See *North American Cold Storage Co. v. City of Chicago*, 211 U.S. 306 [29 S.Ct. 101, 53 L.Ed. 195] (seizure of unwholesome food); *Jacobson v. Massachusetts*, 197 U.S. 11 [25 S.Ct. 358, 49 L.Ed. 643] (compulsory smallpox vaccination); *Compagnie Francaise v. Board of Health*, 186 U.S. 380 [22 S.Ct. 811, 46 L.Ed. 1209] (health quarantine); *Kroplin v. Truax*, 119 Ohio St. 610, 165 N.E. 498 (summary destruction of tubercular cattle).

*Id.* at 539, 87 S.Ct. at 1736.

The third factor identified by the *Clifford* plurality is easily met. There was ample evidence for the jury to conclude that the sole reason that the officers entered Mann's house was to eliminate a public health hazard about which they were seriously alarmed.

That the jury could find the earlier entries to be constitutional, of course, does not end the inquiry with respect to April 19. The harder question is whether the justification present on April 16, allowing the entry of the property before Dr. Mann's arrival, could continue to shield the

officers on April 19 when the clean-up resumed. In *Clifford* the plurality explained that whether a "challenged search [is] ... a continuation of an earlier search" turns on a number of factors, including not only the time delay between the entries but also any "interim efforts" taken by the owner "to secure the privacy interests that remained in [the building] against further intrusion" and the degree of privacy generally associated with the type of structure. *Id.* —— U.S. at ——, 104 S.Ct. at 648. "At least where a homeowner has made a reasonable effort to secure his fire-damaged home after the blaze has been extinguished and the fire and police unit have left the scene," the Court held, "a subsequent post-fire search must be conducted pursuant to a warrant, consent, or the identification of some new exigency." *Id.*

Here, the jury could conclude, Mann's privacy interests in the property were largely unchanged from the 16th to the 19th of April. Far from taking steps to secure the house from further intrusion, he had made arrangements for the clean-up to continue with his cooperation, strongly implying that he was willing to have the clean-up proceed on Monday. The jury could have found that the defendants reasonably relied on Mann's acquiescence. Moreover, while the health officers had left the scene for the weekend, the jury could conclude that the house never left their custody for throughout that time it remained guarded by Warwick police officers. And, unlike *Clifford* where the flames had been doused, the same danger remained here unabated except for the police guards. Under these circumstances the jury could conclude that the resumption of the clean-up on April 19 was reasonable.[7]

---

6. Had Mann kept his controlled substances in his former office or in a true warehouse—both "controlled premise[s]" under R.I.Gen. Laws § 21–28–5.02(1)(b)—and not moved them to the unregistered Alden Avenue property—which thereby became a "common nuisance," R.I.Gen. Laws § 21–28–4.06—he would seemingly have been obligated by Rhode Island law to permit the officers' entry, at least for inspection pur-

poses. *See* R.I.Gen. Laws §§ 21–28–5.02(2), 21–28–4.02(A)(4). Improper storage of the drugs, by itself, may have converted them to contraband, subjecting them to seizure and confiscation. *See* R.I.Gen. Laws § 21–28–5.06.

7. While the jury's finding (in response to a special question) that defendants did not violate Mann's constitutional rights required it to skip over a further question concerning the defense

Nothing in the compliance order requires a different conclusion. The order, the jury could conclude, was merely a "legal document," like that demanded by Mann on April 16, reflecting the understanding between the parties and defining the scope of the clean-up. They could conclude that it in no way suggested that Mann's will was overborne. *Cf. Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (consent search).

Dr. Mann contends that his constitutional rights were necessarily violated because the officers took more of his property than was justified simply to safeguard the community. The officers testified, however, that they limited the clean-up to controlled substances, other dangerous materials and garbage. These were items the removal of which, the jury could infer, had been permitted by Mann on the 16th. The jury was entitled to reject other versions and to believe the officers. To be sure, the inventories maintained by the officers showed that such items as a tube of KY Jelly, a Mennen Speed Stick, a porcelain tray, and several notebooks were seized. The inventories, however, do not show whether these were taken on April 16, from which no claim would lie, or on the 19th. The jury could conclude, moreover, based upon certain testimony, that these few items were either so sullied and damaged that they lacked all value or so intermingled with other items that it was not reasonable to try to separate them out.

■ Mann also argues that he is entitled to a new trial on the section 1983 search and seizure claim because of various evidentiary rulings and jury instructions.

Mann first complains that he was unfairly prejudiced by the introduction of evidence concerning "children and drugs." Fed.R. Evid. 403. This evidence, however, was probative of the officers' view of the exigency before them. Fed.R.Evid. 401. The court gave limiting instructions on several occasions concerning the limited relevance of this evidence. We find no abuse of discretion.

■ Mann's claim that the court improperly instructed the jurors on the scope of the clean-up operation also fails. The court specifically instructed the jury to consider whether the search and seizure was conducted in a "reasonable manner." Mann was not entitled to an instruction based upon *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). That case defined the proper limits of a search for evidence incident to an arrest.

■ Mann argues that the court improperly instructed the jury, over his objection, that to prevail on his section 1983 claims he had to prove "that the acts complained of were the proximate or legal cause of damages sustained by the Plaintiff." Mann contends that proof of proximately caused damages is not necessary to make out a section 1983 tort; nominal damages may be awarded without proof of actual injury. *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978) (procedural due process claim). *See also Rodriguez de Quinonez v. Perez,* 596 F.2d 486 (1st Cir.1979); *Perez v. Rodriguez Bou,* 575 F.2d 21 (1st Cir.1978). Dr. Mann's attorney, however, did not present this objection in any coherent fashion, as required by Fed.R.Civ.P. 51, after the court had

---

of good faith immunity, it is extremely unlikely—given the jury's view on the first issue—that it would not also have found for defendants on the second. Such a finding was clearly warranted, as the district court noted.

[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982). Whether a

post-exigency search retains the mantle of the initial justification is a difficult issue over which even jurists may sharply disagree. *See Clifford,* — U.S. at —, 104 S.Ct. at 652 (Rehnquist, J., dissenting).

We do not emphasize this point only because the jury never indicated that it reached the issue. (For the same reason we need not consider Mann's assertion that the court erred in excluding certain rebuttal evidence and instructing the jury on this same issue.)

instructed the jury. *Gay v. P.K. Lindsay Co.*, 666 F.2d 710, 712 (1st Cir.1981), *cert. denied*, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 849 (1982). His only objection was the following:

> MR. McKENNA: [T]he charge given on proximate cause was proximate cause for damages, not proximate cause of the wrong.... I object to the instruction on proximate cause as to the, not damages, but as to the wrong.
>
> THE COURT: Fine.

This objection did not suggest that the court had in any way erred in its instruction as to damages, nominal or otherwise. Taking the instructions as a whole, moreover, the jury could not believe that it lacked authority to award nominal damages. The court explained in its charge, following the proximate cause instruction, that if a constitutional violation was found but no compensatory damages proven, "the proper course would be to award the plaintiff nominal damages which would be damages of one dollar." Plaintiff did not object to this instruction. Assuming the proximate cause instruction was incorrect, it was not plain error leading to a "clear miscarriage of justice." *Nimrod v. Sylvester*, 369 F.2d 870, 873 (1st Cir.1966), *quoted in Gay*, 666 F.2d at 712 n. 1.

We have considered Mann's request for a new trial on his search and seizure claim on the grounds that the verdict was against the weight of the evidence. We find no abuse of discretion in the denial of his motion below. *Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982).

## II. FALSE ARREST CLAIM

■ Shortly after Rhode Island health officers reentered his house on April 19,

1976, Dr. Mann was arrested and charged with knowingly and intentionally possessing controlled substances without proper registration in violation of R.I.Gen.Laws § 21–28–4.01(C)(1)(a). *See State v. Mann*, 119 R.I. 207, 382 A.2d 1319 (1978).[8] Mann claimed that his arrest was unlawful, both under section 1983 and under Rhode Island law. Both claims were submitted to the jury. The jury found for the officers on the federal claim, but for Mann on the state law claim. Arguing that these verdicts were inconsistent, both parties sought judgment n.o.v. Fed.R.Civ.P. 50(b). These motions were denied.[9]

### A. Plaintiff's Motions on Section 1983 False Arrest Claim

To prove a section 1983 false arrest claim, in the posture of this case at least, plaintiff must show at minimum that the arresting officers acted without probable cause. *Landrigan v. City of Warwick*, 628 F.2d 736, 743 (1st Cir.1980) (arrest made without probable cause and in bad faith presented section 1983 claim) (collecting cases). Here, however, the evidence was uncontested that the items seized on April 16 and 19 included controlled substances, that they belonged to Dr. Mann, and that he was no longer registered to possess them. He argues, however, that the arrest was improper since he was exempt from the registration statute as a warehouseman. R.I.Gen.Laws § 21–28–3.-30. *See supra* note 6. We need not reach this improbable assertion for, on the facts of this case, it was plainly not so strong as to vitiate probable cause.[10]

Mann argues that whether or not probable cause existed with respect to the drug offense for which he was charged, he was entitled to judgment n.o.v. because the offi-

---

8. By agreement, the criminal charges against Dr. Mann, which were still pending and untried when this section 1983 action was reached for trial, were dismissed so as to permit this case to go forward without delay. *See Landrigan v. City of Warwick*, 628 F.2d 736, 743 (1st Cir. 1980).

9. Mann appeals from the denial of judgment n.o.v. against the four state officials involved in his arrest. His motions, however, only list three defendants, making no mention of DelGuidice.

10. Below Mann also argued he was exempt as an osteopath. The Rhode Island Supreme Court rejected this argument in *State v. Mann*, 119 R.I. 207, 382 A.2d 1319 (1978).

cers had an "ulterior motive" for the arrest, namely to bar his resistance to their unconstitutional seizure of non-controlled personal property. The evidence does not compel a finding that this was the motive, however. The jury's finding for defendants on the search and seizure claim undercuts any argument that the officers arrested Mann specifically in retaliation for his exercise of fourth amendment rights. This is not to say there may not be "egregious situation[s] where an arrest on *purely colorable grounds* might be held invalid as 'pretextual.'" *United States v. McCambridge,* 551 F.2d 865, 870 (1st Cir.1977) (emphasis supplied). *See also United States v. Miller,* 589 F.2d 1117, 1128 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979). But the charges against Mann were much more than colorable. And to the extent defendants were goaded into the arrest by his bizarre conduct—which, the jury could find, included jumping into the garbage compactor truck—plaintiff cites no precedent even suggesting that an arrest made with probable cause violates section 1983 merely because induced by such a motive. *See supra* note 11. Certainly nothing in this case would cause us to depart from the general rule that "the validity of an arrest is normally gauged by an objective standard rather than by inquiry into the officer's presumed motives." *United States v. McCambridge,* 551 F.2d at 870. *See also Hunter v. Clardy,* 558 F.2d 290, 291, 292 (5th Cir.1977) (adopting Georgia rule that officers' "collateral bad faith" is immaterial to section 1983 false arrest claim once probable cause is established). The circumstances plainly did not warrant directing the jury to find that Mann had been falsely arrested in violation of section 1983.

We have considered Dr. Mann's other arguments and find them without merit.

### B. *Defendants' Motion on State Law False Arrest*

We come now to defendants' motions for directed verdict and judgment n.o.v. with respect to the single claim on which Mann prevailed—his claim for false arrest under Rhode Island law. For defendants to prevail they must show that "the evidence could lead reasonable men to but one conclusion." *de Mars v. Equitable Life Assurance Society,* 610 F.2d at 57.

As with Mann's federal false arrest claim, "[t]he essential element of this tortious action" under Rhode Island law "is the restraint of another person without legal justification or without any color of legal authority." *Mailey v. Pasquale's Estate,* 94 R.I. 31, 34, 177 A.2d 376, 379 (1962), *quoted in Clarke v. Sullivan,* 99 R.I. 196, 205 A.2d 828, 830 (1964); *Johnson v. Palange,* R.I. 406 A.2d 360, 362 (1979) (arrest must be made "without legal justification"). "The dispositive issue is ... whether there were sufficient facts to give [the arresting officer] probable cause or reasonable grounds to believe that [the plaintiff] had violated the statute" with which he was charged. *Id.* at 366. *See also Powers v. Carvalho,* 117 R.I. 519, 368 A.2d 1242, 1246 (1976) (action for false imprisonment lies for arrest "made without valid process or under void process," malice "not essential element"; malicious prosecution claim requires " 'clear proof' of malice and want of probable cause"). "If a lawful cause of action exists, the arrest shall be lawful even though the officer made the arrest on an improper ground." R.I.Gen. Laws § 12–7–5.

The evidence is uncontested here that, prior to arresting Mann, the officers had seized controlled substances belonging to him which he was no longer registered to possess. As we have already indicated, we see no reasonable question in the record but that the officers had probable cause to arrest Dr. Mann for unregistered possession of controlled substances. Nor is there a question that there was a "lawful cause of action."

As in the federal claim based on alleged false arrest, Mann asserts that the officers can be held liable for false arrest, irrespective of the existence of probable cause, because of their "ulterior motive" for making the arrest. This was the theory on which the district judge denied defendants' motion for judgment n.o.v., notwithstanding his strongly expressed reservations

concerning the correctness of the jury's verdict on this claim.[11] Plaintiff, however, points to no Rhode Island case or statute which supports this theory. The one case he suggested at oral argument, *Pimental v. Postoian*, 112 R.I. 207, 393 A.2d 1097 (1978), merely holds that collateral bad faith may be relevant to the issue of punitive damages, where liability has first been established. All the Rhode Island authority which we found holds that probable cause is dispositive, absent a facially unconstitutional statute or the like. *See Johnson v. Palange*, R.I., 406 A.2d 360 (1979).

As the evidence could "lead reasonable men to but one conclusion" on the issue of probable cause to arrest, we think the jury could not properly find in plaintiff's favor on his state law claim for wrongful arrest. Defendants, therefore, were entitled to entry of judgment n.o.v. on this count.

*The judgment of the district court is affirmed, except it is reversed with respect to the verdict in favor of plaintiff on the Rhode Island false arrest claim.*

---

11. The district court, in struggling to uphold the jury verdict, found, consistent with its instruction on this matter to the jury, that there was "sufficient evidence in the record from which the jury could have concluded that the arrest was motivated by a perfectly understandable impatience and frustration with [Mann's] actions but was not carried out for the ostensible reasons given." The court, like plaintiff, cites to no precedent holding that such collateral motivation gives rise to liability where probable cause exists to make an arrest.