**Russell Eugene HURD,
Plaintiff-Appellee,**

v.

**AMERICAN HOIST AND DERRICK COMPANY, a Delaware Corporation, Defendant-Appellant.**

**No. 82–2176.**

United States Court of Appeals, Tenth Circuit.

May 11, 1984.

David P. Madden, Tulsa, Okl. (Jack Y. Goree of Whitten, Goree, Davies & Mad-den, Tulsa, Okl., was also on brief), for plaintiff-appellee.

S.M. Fallis, Jr., Tulsa, Okl. (Jerry R. Nichols of Nichols & Wolfe, Inc., Tulsa, Okl., was also on brief), for defendant-appellant.

Before HOLLOWAY, DOYLE and LOGAN, Circuit Judges.

HOLLOWAY, Circuit Judge.

This is an appeal by American Hoist and Derrick Company (defendant) from an adverse judgment in a products liability suit removed to the district court on diversity grounds. Russell Hurd (plaintiff) brought this action and in a jury trial the district court directed a verdict in plaintiff's favor and denied a subsequent motion for a new trial and for a remittitur.

### I

The facts as shown by plaintiff's evidence were as follows. On September 26, 1978, the plaintiff suffered head injuries in an accident while working at an oil well drilling site in Osage County, Oklahoma. Plaintiff's skull was crushed when the side plates of an oil field safety block separated and the pulley wheel between the side plates was catapulted into the top of his head. Plaintiff survived, but bone fragments had to be surgically removed from his skull. In a subsequent operation, an acrylic cranioplasty was performed to cover the hole in plaintiff's skull.

The block in question had been manufactured between the years 1947 and 1951 by the McKissick Company. Defendant acquired McKissick in 1959. Plaintiff sued defendant as a successor corporation on a theory of products liability.

At trial plaintiff called five witnesses and submitted numerous exhibits. After the close of plaintiff's evidence, defendant announced it would offer no evidence and rested. Defendant moved for a directed verdict, as the court's order reflects. I R.

53.[1] In support of its motion, the defendant relied completely on its position that it could not be liable as a successor corporation. Following defendant's lead, plaintiff also moved for a directed verdict. After substantial research, the court granted plaintiff's motion as to liability and advised the parties that he would submit the issue of damages to the jury. The trial judge reasoned that he could have acted in no other way because defendant offered no evidence to challenge plaintiff's allegation of material defect. That being true, plaintiff's position as to defect was proven by default and by acquiesence of silence.[2] He submitted the damages issue to the jury, which returned a verdict for plaintiff of $80,000.00.

On appeal, defendant presents two issues. It contends that: (1) the trial court erred in directing a verdict for plaintiff because issues of fact existed regarding defendant's liability; and (2) the trial court erred in refusing to grant a remittitur because the damages were excessive, and not supported by the evidence.

## II

Although the underlying cause of action is governed by the substantive law of Oklahoma in this diversity case, the sufficiency of the evidence for purposes of granting a directed verdict is governed by federal law. *E.g., Peterson v. Hager,* 724 F.2d 851, 853–54 (10th Cir.1984) (Opinion on Rehearing); *Hidalgo Properties, Inc. v. Wachovia Mortgage Co.,* 617 F.2d 196, 198 (10th Cir.1980); *Yazzie v. Sullivent,* 561 F.2d 183, 188 (10th Cir.1977). In deciding whether to grant a directed verdict, the trial court must view the evidence most favorably to the party against whom the motion is made, and give that party the benefit of all reasonable inferences. *Yazzie, supra,* 561 F.2d at 188; *see also Peterson, supra,* 724 F.2d at 853. The court may not weigh the evidence or pass upon the witnesses' credibility, or substitute its judgment for that of the jury. *Yazzie, supra,* 561 F.2d at 188; 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2524, at 543–44 (1971).

Motions for a directed verdict and for judgment n.o.v. are considered under the same standard. *E.g., Thompson v. Kerr-McGee Refining Corp.,* 660 F.2d 1380, 1389 (10th Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982); *Yazzie, supra,* 561 F.2d at 188; 9 Wright & Miller, *supra,* § 2524, at 543–44. Although we have often used differing phraseology to express this standard,[3] we believe that

---

1. We refer to the order the court issued in denying defendant's motion for a new trial and for remittitur. *See* I R. 53–54. The transcript that has been transmitted to us on appeal does not contain plaintiff's or defendant's oral motions for directed verdicts. In reconstructing what transpired at trial, we have relied entirely on the trial court's description of these events in his order denying defendant's motion for a new trial and for a remittitur.

2. From our reading of the record, it appears that the trial judge ruled against defendant because its sole defense was that it could not be liable as a successor corporation. The trial judge found this defense to be without merit. On appeal, defendant does not affirmatively renew its argument that it cannot be liable as a successor corporation. Instead, it argues that a directed verdict for plaintiff was improper because issues of fact existed. Accordingly, we do not review the trial court's ruling regarding defendant's liability as a successor corporation. Our examination of the record convinces us that the trial judge correctly granted plaintiff's motion because no reasonable jury could find in

favor of defendant on the basis of the evidence adduced at trial.

3. *E.g., Peterson v. Hager,* 724 F.2d 851, 853–54 (10th Cir.1984) ("directed verdict is proper only when the evidence is so patently in favor of the moving party that a jury verdict in favor of the opposing party would be improper and would have to be set aside by the trial judge."); *Thompson v. Kerr-McGee Refining Corp.,* 660 F.2d 1380, 1389 (10th Cir.1981) ("question is not whether there is no evidence supporting the party against whom the motion is made, but whether there is evidence upon which the jury could probably find a verdict for that party"), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982); *Smith Machinery Company, Inc. v. Jenkins,* 654 F.2d 693, 697 (10th Cir.1981) ("standard to be applied in determining whether to grant a motion for directed verdict is not whether there is literally no evidence to support the party opposing the motions, but whether there is evidence upon which the jury could properly find a verdict for that party."); *Continental Oil Co. v. Natrona Service, Inc.,* 588 F.2d

they all have essentially equivalent meaning, which is best summarized by Wright & Miller: "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." 9 Wright & Miller, *supra*, § 2524, at 543 (footnote omitted).

■ Although it is an exceptional case when such a ruling is made in favor of the party with the burden of proof, *United California Bank v. THC Financial Corp.*, 557 F.2d 1351, 1356 (9th Cir.1977), motions by that party may be granted. *See, e.g.*, *Smith Machinery Company, Inc. v. Jenkins*, 654 F.2d 693 (10th Cir.1981) (affirming a directed verdict on the ground that defendant was in default on promissory note, and awarding plaintiff principal, interest, and attorney's fees); *Ford Motor Credit Co. v. Milburn*, 615 F.2d 892, 897 (10th Cir.1980) (trial court erred in refusing to grant judgment n.o.v. against defendant); *Continental Oil Co. v. Natrona Service, Inc.*, 588 F.2d 792, 799–800 (10th Cir. 1978) (upholding grant of directed verdict and judgment n.o.v. for plaintiff in declaratory action); *see also* 9 Wright & Miller, *supra*, § 2535, at 590–93.

When the party with the burden of proof moves for a directed verdict the evidence must be viewed from a different perspective. Rather than considering the evidence for its sufficiency to support a finding for the opposing party as is done when the party not having the burden of proof has made such a motion, the evidence is tested for its overwhelming effect. *See United California Bank v. THC Financial Corp.*, *supra*, 557 F.2d at 1356; *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir.1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977); 9 Wright & Miller, *supra*, § 2535, at 592–93. The test is a strict one, and a directed verdict for the party having the burden of proof may be granted only where he has

established his case by evidence that the jury would not be at liberty to disbelieve. *Service Auto Supply Co. v. Harte & Co. Inc.*, 533 F.2d 23, 25 (1st Cir.1976).

In considering the propriety of granting a directed verdict, the court may not weigh the evidence or make credibility determinations. A directed verdict for the party bearing the burden of proof may be granted only if the evidence is such that without weighing the credibility of the witnesses the only reasonable conclusion is in his favor *Service Auto Supply Co. v. Harte & Co., Inc.*, *supra*, 533 F.2d at 25. The court "must take as true 'testimony concerning a simple fact capable of contradiction, not incredible, and standing uncontradicted, unimpeached and in no way discredited by cross examination ....' " *Ford Motor Credit Co. v. Milburn*, 615 F.2d 892, 897 (10th Cir.1980) (quoting *Chicago, Rock Island & Pacific Ry. v. Howell*, 401 F.2d 752, 754 (10th Cir.1968)); *see also Chesapeake & Ohio Railway Co. v. Martin*, 283 U.S. 209, 216, 51 S.Ct. 453, 456, 75 L.Ed. 983 (1931).

With these strict rules in mind, we hold that the trial court correctly directed the verdict in plaintiff's favor. Initially we note that plaintiff's case was established largely on the testimony of Dr. Robert Block who had an impressive educational background and record of experience as a mechanical and metallurgical engineer. His acceptance as an expert in both fields was not objected to by defendant. IV R. 2–6.

■ Under Oklahoma law a plaintiff suing on a theory of manufacturer's product liability must prove three elements to prevail. As the Oklahoma Supreme Court has explained, a plaintiff must prove that: (1) the product was the cause of the injury; (2) a causally related defect existed in the product at the time it left the manufacturer's possession and control; and (3) the defect rendered the product unreasonably dangerous to the plaintiff or his property.

792, 800 (10th Cir.1978) ("directed verdict is properly granted where there is no evidence or dispute or the evidence, although in conflict, is

of such a conclusive nature that if a verdict were reached in favor of one party, judicial discretion would require that it be set aside").

*Kirkland v. General Motors Corp.*, 521 P.2d 1353, 1363 (Okl.1974); *see also Tigert v. Admiral Corp.*, 612 P.2d 1381, 1383 (Okl.App.1980). Unreasonably dangerous means " 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' " *Kirkland, supra*, 521 P.2d at 1362–63 (quoting Restatement (Second) of Torts § 402A comment g).

▓▓▓ Here the plaintiff's evidence established all three elements that must be proven under *Kirkland*. First, it showed

4. Plaintiff's expert testified that a design defect existed in the product. IV R. 16. This is sufficient to establish that a defect existed in the product when it left the manufacturer. He said that a sleeve bearing was damaged, and had some ragged edges. The ragged edges caused the rotation of the bearing to wear against the side plate, cutting it "like you would cut a hole with a cookie cutter." IV R. 14. This made the entire system unstable, and subject to catastrophic collapse because the hole was so large that the nut holding the side plates together could slip through it. Without the nut to hold the side plates together, under the stress of the load, the side plates bent, permitting the wheel to fall. IV 13–25.

5. As noted, under Oklahoma law a product is unreasonably dangerous if it is more dangerous than "would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community." *Kirkland, supra*, 521 P.2d at 1362–63. Plaintiff's expert testified that

> [the product] wears gradually, but then it suddenly gives way and that sudden giving way is the thing that leads to accidents.... I would expect as the thing is used and used more it would tend to wear out, of course, but it's not the wearing out that offers the problem, it's the way that it wore out and then gave way suddenly without warning. It should, if it's going—if it's a product that wears, has a useful life and then wears out it should give warning that it is wearing out and that it should be replaced. This apparently didn't give any warning that it was wearing out.... Generally when these things wear out or when something goes wrong with a pully or a thing with a bearing in it, it's usually the bearing that gives way first and gives you some indication of some noise or something like that in the bearing that tells you that it isn't working right or the bearing freezes up.

IV R. 17–18.

that the product caused the injury. Second, the testimony of plaintiff's expert witness established that there was a design defect in the product at the time it left the manufacturer.[4] Third, the testimony of plaintiff's expert taken as a whole also demonstrated that the product was unreasonably dangerous under Oklahoma law.[5] Defendant offered no evidence to refute plaintiff's expert, nor did defendant's attorney discredit plaintiff's expert on cross-examination. IV R. 18–26. This testimony standing uncontradicted, unimpeached, and not discredited by cross-examination must be taken as true.[6] *Cf. Stafos v. Missouri*

The thrust of this testimony is that the product is dangerous because the manner in which it wears makes it prone to sudden and unexpected collapse. In our view, this is sufficient to establish that the product was unreasonably dangerous under Oklahoma law.

6. At trial, defendant argued that it could not be liable for plaintiff's injuries because the product was produced by McKissick Corporation between 1947 and 1951, and that it was not until 1959 that defendant acquired McKissick. The trial judge rejected this contention. He reasoned that defendant could possibly have avoided liability if McKissick had remained in existence as a separate entity. *See Utley v. Standard Magnesium & Chemical Co.*, 478 P.2d 953 (Okl. 1971). Further, he reasoned that *Pulis v. United States Electrical Tool Co.*, 561 P.2d 68 (Okl.1977) could be read as standing for the proposition that "when an original corporation is assimilated and absorbed by a successor and continues to operate as an entity within the successor but ceases to be an entity in and of itself, a de facto merger can be assumed which makes the successor liable for the acts and products of the original entity." VIII R. 3–4.

The court then reviewed the evidence and found that the Crosby group, a wholly owned subsidiary of defendant, acquired McKissick in 1959. VIII R. 4–5, V R. 4. The assets acquired were the buildings, land, machinery inventory and engineering drawings. VIII R. 5; V R. 5. Some former McKissick employees continued to work for defendant. After this transaction, defendant continued to use the name McKissick to identify some of its products and its current price list identifies blocks similar to that at issue as McKissick products. VIII R. 5; V R. 9–11. In addition, when Mr. Crook, an employee of defendant, was asked whether McKissick had a good reputation for the manufacture of oil field products, he said: "We like to think that we do, yes." V R. 6. The court concluded that the defendant had availed itself of the economic

*Pacific Railroad*, 367 F.2d 314, 317 (10th Cir.1966) (although expert evidence may be contradicted by lay testimony, if "evidence —expert or non-expert—is all one way, there is no room for a contrary finding.").

■■■ Defendant argues that the "defenses of change of condition and the fact that a supplier is not liable where harm results from normal wear and tear" precluded granting plaintiff's motion for a directed verdict. Brief of Appellant 24. However defendant offered no evidence at trial and we do not believe that plaintiff's evidence raised the above issues sufficiently so that they had to go to the jury. Although there was arguably some evidence suggesting that there had been a change in condition, it was insufficient to raise a jury question.

Plaintiff called Edward Crook—an employee of a wholly owned subsidiary of defendant. On cross-examination the following took place.

[Defendant's counsel]

Now, is that block, in your knowledge of the industry, is that in the condition it would leave the manufacturer?

A. No, sir.

Q. How would it have been changed? For example, has it been painted?

A. It has been painted but—and I really do not know whether McKissick Products Corporation was using a white paint at that time or not. It would—all you can relate to is what we have, my knowledge of what we have done in the past and so forth and we would not have painted it this color. It would have been painted a blue color. (IV R. 14).

This testimony amounted to only a conclusory statement that the block is in a different condition, coupled with an ambiguous explanation that it may have been repainted. In our view this is insufficient to create a jury question. Furthermore, defendant's argument that the testimony of plaintiff's expert injected the issue of a

changed condition because he testified that the cause of the accident was the breaking of a sleeve is also without merit. The testimony of plaintiff's expert did not create a jury issue on this question. Rather, the witness merely testified in substance that there was a design defect which permitted the product to fail unexpectedly.

■■■ Defendant also argues that "the proof of the long life of the block, that is the interval of thirty (30) years between its manufacture and the accident," is a fact that should have caused the liability issue to be submitted to the jury. Brief of Appellant at 23–24. Apparently, defendant is arguing that the lapse of time in and of itself created a jury question as to whether the defect existed in the product when it left the manufacturer. We cannot agree. Although under Oklahoma law a lapse of time between sale and the accident may frequently prevent an inference that the product was defective when sold, it does not preclude a finding of defectiveness at the time of sale. *Hawkins v. Larrance Tank Corp.*, 555 P.2d 91, 94–95 (Okl.App. 1976). The uncontradicted testimony of plaintiff's expert established that the age of the product did not have a bearing on the "kind of failure" that took place when plaintiff was injured. That the product wore out is not what created the problem. Instead it was the manner in which it wore out. IV R. 17. Plaintiff's expert also testified that there was "not really" "any functional way to determine the useful life of a metal product." *Id.* at 17. The expert said that here the hub of the nut was the key to the problem and that if the nut holding the side plates together had been bigger, "the accident wouldn't have happened." *Id.* at 22.

■■■ Defendant also argues that the court applied the incorrect legal standard in granting plaintiff's motion for a directed verdict. Defendant contends that when

advantages of the McKissick name, and that in view of the policies behind strict liability, defendant should not be allowed to escape the disadvantages.

On appeal, defendant has not renewed its contention that it cannot be liable as a successor corporation. We therefore have no occasion to review the trial court's reasoning on this point.

ruling on plaintiff's motion, instead of drawing all reasonable inferences in favor of defendant, the court viewed the evidence most favorably to plaintiff.

In support of its position, defendant cites the following from the record of the trial judge's ruling. "The Court in addressing the weight of the evidence at this stage of the case must consider the evidence and all reasonable conclusions to be drawn therefrom *in the light most favorable to plaintiff.*" VIII R. 4 (emphasis added). The trial judge's discussion following the quoted statement deals with the defendant's theory that it was not liable as a successor corporation. For this reason, the court may have cited the rule for considering the evidence in the light most favorable to the plaintiff because he had in mind the defendant's motion for a directed verdict. The judge did, however, conclude his discussion on liability by granting judgment in favor of the plaintiff as to liability. Thus arguably there was error by application of the wrong standard in ruling on the plaintiff's motion for a directed verdict.

We do not, however, find any reversible error in the record. The ultimate question is whether the trial court correctly granted the directed verdict for the plaintiff on liability in light of the record evidence. Since we hold that he did properly grant that motion, any error in the statement concerning the rule he applied was harmless. *See* 28 U.S.C. § 2111.

### III

After directing a verdict for plaintiff on the issue of liability, the trial judge submitted the issue of damages to the jury. He instructed the jury that plaintiff sought recovery of $8,800.00 for lost earnings, $10,769.98 for medical expenses, $100,000.00 for severe and permanent injuries and great pain of body and mind, and $100,000.00 for permanent disability. I R. 38–39. In no event was the jury to award more than $219,599.98. I R. 38–39.

■ The jury returned a verdict of $80,000.00 for plaintiff. Defendant argues that this verdict is excessive and not sup-

ported by the evidence. Hence, the trial court erred in not granting a remittitur. Defendant does not challenge the proof concerning plaintiff's lost earnings or medical expenses; rather it challenges the award of over $60,000.00 for "severe and permanent injuries, great pain of body and mind and permanent disability." Brief of Appellant at 34. Defendant points to the testimony of Dr. Billings, who treated Hurd, that Hurd's condition was "fine" when he was discharged from the Doctor's care, that Hurd had no physical impairment and that there was only a small chance of his having any future neurological problems. Defendant also stresses Hurd's testimony that his pain occurred when he got to the hospital for a day and a night and that it was "solid" for two or three days after surgery and then intermittent for three or four weeks. VII R. 10, 31.

We cannot agree that the award was either excessive or unsupported by the evidence. One of plaintiff's co-workers who was present when the accident occurred testified that plaintiff's head was bleeding severely. "[Blood] was squirting through [another co-worker's] fingers and he was trying to hold compression against [plaintiff's] head." The blood was coming through his fingers rhythmically "as in a heart beat." VI R. 9. Dr. Billings testified by deposition that plaintiff had a skull fracture that was "about 2 inches long and about a half inch deep." II R. 7.

Plaintiff had to undergo surgery on two occasions because of the accident. II R. 11. First the bone fragments had to be removed from his skull, leaving plaintiff with a round hole in the top of his head approximately two inches in diameter. VI R. 16. Plaintiff remained in the hospital for approximately seven days. VII R. 12. He had "severe" and "throbbing" head pain for two or three days and then intermittently for three or four weeks. VII R. 10. Several months after the first operation, plaintiff underwent surgery to close the hole in his skull with an acrylic plastic. II R. 11–12. Plaintiff testified that he is "totally conscious" of the plate in his skull. "It feels sometimes like the hair is stinging

or a fuzzy feeling just around the top of my head." VII R. 19.

In light of the evidence of serious injury and pain and suffering, we are not persuaded that the damage award was excessive or unsupported by the evidence. "[A]bsent an award so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the fact is considered inviolate." *Garrick v. City and County of Denver,* 652 F.2d 969, 971–72 (10th Cir. 1981) (quoting *Barnes v. Smith,* 305 F.2d 226, 228 (10th Cir.1962)). Under our standard, we conclude that here the award was not so plainly excessive that we should infer that it was the result of passion or prejudice, and we cannot hold the award is shocking to the conscience of the court; therefore we should not order a remittitur. *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 703 F.2d 1152, 1170–71 (10th Cir.1981) (en banc) (plurality opinion), *cert. denied,* —— U.S. ——, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983).

We find no error in the trial court's rulings and the verdict and judgment are amply supported by the evidence. Accordingly the judgment is

AFFIRMED.