**WARNER FRUEHAUF TRAILER COMPANY, INC., Appellant,**

v.

**William BOSTON, et al., Appellees.**

No. 93–CV–173.

District of Columbia Court of Appeals.

Argued Sept. 27, 1994.
Decided Feb. 23, 1995.

D'Ana E. Johnson and Robert G. McGinley, Washington, DC, for appellant.

Michael H. Feldman, Christopher V. Tisi, and Angela Ciccolo, Washington, DC, for appellees.

Before SCHWELB and KING, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

This is an appeal from the trial court's decision to set aside the original jury verdict in favor of defendant Warner Fruehauf Trailer Company, Inc. and from its subsequent decision to grant a directed verdict in favor of plaintiffs William and Elizabeth Boston at a second trial. On appeal, Warner Fruehauf argues that the trial court erred in ruling that the assumption of risk instruction it gave the jury during the first trial was unwarranted and required the court to strike the defense verdict, and that the trial court's decision to grant plaintiffs a directed verdict on liability at the second trial was erroneous because the evidence presented supported an assumption of risk defense and failed to establish that, as a matter of law, the design of appellant's product was defective and unreasonably dangerous. We affirm.

## I.

Appellee William Boston, a supervising mechanic for the Potomac Electric Power Company ("PEPCO"), was injured on the job due to the malfunction of an Anthony A–146 single cylinder liftgate attached to the back of a PEPCO truck. Boston had responded early on a Sunday morning to an emergency call to obtain a material truck and a work crew to respond to a power outage. He obtained a truck, one he had never used before, and with the help of one of his crew members began to unload it so that he could load it with equipment needed to remedy the outage. After they had used the liftgate to remove some heavy objects from the truck, and Boston's crew member had returned the liftgate platform to, or at least near, the vertical "closed" position at the back of the truck, Boston approached the liftgate to attach the safety chains. The liftgate suddenly malfunctioned, and the 1050 pound metal platform fell free, striking Boston and injuring his hip.

Boston and his wife filed a complaint against the liftgate manufacturers and the liftgate distributor, appellant Warner Fruehauf.[1] Appellees proceeded to trial only against Warner Fruehauf, seeking damages for personal injury and loss of consortium on a theory of strict liability in tort based on the defective design of the liftgate.[2]

The first trial was held in Superior Court before a jury of six with Judge Robert A. Shuker presiding. Most of the Bostons' evidence was directed toward establishing that the one-cylinder hydraulically-controlled liftgate was defectively designed and unreasonably dangerous in that it had no backup system to prevent a free-fall of the heavy tailgate in the event of a mechanical failure.[3] At the close of all the evidence, Warner Fruehauf requested the standard "bluebook" strict liability assumption of risk instruction. Standardized Civil Jury Instructions for the District of Columbia No. 11–16 (Strict Liability—Assumption of Risk) (1985 Supp.). The

---

1. Appellees received default judgments against the liftgate manufacturers—the Anthony Company, the Anthony York Company, and the York Trailer Company.

2. Prior to trial, the Bostons dismissed their negligent design claim.

3. According to testimony, the mechanical failure that precipitated the accident was most likely the failure of the hook latching mechanism to lock positively when the liftgate was placed in the vertical or near-vertical position against the truck. Testimony also indicated, however, that a mechanical failure could result from low hydraulic fluid which would cause the single cylinder not to work correctly.

court gave the instruction over the Bostons' objection. The jury returned a verdict in favor of Warner Fruehauf. The Bostons filed a motion for a new trial. Judge Shuker concluded that the evidence of record had not warranted instructing the jury on assumption of risk, and entered an order granting the motion.

The second trial was also held before a jury of six, and Judge Shuker again presided. At the close of all the evidence, the judge concluded that, as a matter of law, the liftgate was defectively designed and unreasonably dangerous and that no reasonable juror could find that Boston had assumed the risk of being injured by it. He therefore directed a verdict in favor of the Bostons as to liability.

The case was submitted to the jury on damages only. The jury awarded the Bostons a total of $550,000.00. Warner Fruehauf noted this appeal.

## II.

*(A) Strict Liability in Tort Under D.C. Law*

We begin our analysis with a brief discussion of the law of strict liability in tort in this jurisdiction and the availability of the defense of assumption of risk in strict liability cases. In *Berman v. Watergate West*, 391 A.2d 1351 (D.C.1978), this court recognized a cause of action for strict liability in tort based on principles set forth in the RESTATEMENT (SECOND) OF TORTS § 402A. *Id.* at 1355–59.[4] Under § 402A, the plaintiff must prove by a preponderance of the evidence that: (1) the seller was engaged in the business of selling the product that caused the harm; (2) the product was sold in a defective condition unreasonably dangerous to the consumer or user; (3) the product was one which the seller expected to and did reach the plaintiff

consumer or user without any substantial change from the condition in which it was sold; and (4) the defect was a direct and proximate cause of the plaintiff's injuries. AMERICAN LAW OF PRODUCTS LIABILITY 3D ("Am Law Prod Liab 3d") §§ 16:40–16:42 (3d ed. 1987) (Clark, Boardman, Callaghan). A product may be found defective for § 402A purposes if it has one of three shortcomings: (1) a manufacturing defect; (2) an absence of sufficient warnings or instructions; or (3) an unsafe design. *Id.* at § 17:3.

Until now, this court has not had occasion to review a design defect case based on a theory of strict liability in tort.[5] We have, however, reviewed claims of strict liability based solely on warning defects. *See, e.g., East Penn Mfg. Co. v. Pineda*, 578 A.2d 1113 (D.C.1990) (claim of failure to warn brought against battery manufacturer and seller); *Payne v. Soft Sheen Products, Inc.*, 486 A.2d 712 (D.C.1985) (claim of failure to warn brought against permanent wave product manufacturer); *Russell v. G.A.F. Corp.*, 422 A.2d 989 (D.C.1980) (claim of failure to warn brought against corrugated asbestos cement manufacturer and design engineers). These cases are relevant here because issues arising in warning defect cases and design defect cases often overlap, as they do in the matter at hand.

*(B) Assumption of Risk and Strict Liability*

■ In the District of Columbia, assumption of risk by the injured party, if established, is a complete bar to recovery in a strict liability action. *East Penn, supra,* 578 A.2d at 1118–19 (citing *Payne, supra,* 486 A.2d at 721 n. 9). Assumption of risk is an affirmative defense that, unlike contributory negligence, focuses on the injured party's actual knowledge. In *Sinai v. Polinger Co.*, 498 A.2d 520, 524 (D.C.1985), we discussed

---

4. In *Berman,* we held that any party that was an "integral part of the overall producing and marketing enterprise" that placed the defective product into the "stream of commerce" could be held liable in tort. *Id.* at 1359 (citations omitted). The court stated that the adoption of the concept of strict liability in tort for this jurisdiction can be inferred from *Cottom v. McGuire Funeral Serv., Inc.*, 262 A.2d 807 (D.C.1970). *Id.* at 1357. Thus, Warner Fruehauf, as the liftgate distributor, can be held liable to the same extent as the

liftgate manufacturer if the liftgate is found to have been placed on the market with a defective design.

5. This court has reviewed a design defect case based on a negligence theory. *See Westinghouse Elec. Corp. v. Nutt*, 407 A.2d 606 (D.C.1979) (action brought against elevator manufacturer alleging negligent design).

both assumption of risk and contributory negligence in the context of a negligence action, and concluded, regarding assumption of risk, that "the plaintiff must subjectively know of the existence of the risk and appreciate its unreasonable character." Furthermore, in order to establish an assumption of risk defense in a strict liability action, the defendant must show that the plaintiff knew of the specific defect in the product and was aware of the danger arising from it, but nevertheless voluntarily and unreasonably proceeded to use the product. *Payne, supra*, 486 A.2d at 721–22 n. 9 (citing RESTATEMENT, *supra*, § 402A cmt. n). The language of D.C. Civil Jury Instruction No. 11–16 is consistent with this court's discussion in *Payne*, and appropriately requires proof of the plaintiff's actual knowledge of the specific defect in question and of the danger created by the defect. Standardized Civil Jury Instructions for the District of Columbia No. 11–16, *supra*.[6]

■ Warner Fruehauf failed to present sufficient evidence at either trial to establish an assumption of risk defense. It was not enough to argue that the evidence revealed that Boston had twenty-two years of work experience and training covering "all types of liftgates," and that reasonable jurors could infer that he knew of the general danger associated with standing behind a liftgate. There was no evidence presented at the first or second trial that showed that Boston had actual knowledge of the liftgate's alleged design defect—the lack of a back-up system (e.g., a second cylinder or other safety device) to prevent the heavy liftgate from freefalling in the event of a mechanical failure.

■ Boston testified without contradiction that he had received only a ten-minute safety instruction class covering the operation of liftgates in general and that prior to the day of the accident he had never used a single-cylinder liftgate and had never seen a piece of hydraulic equipment fail. Furthermore, it would be unreasonable to infer that while Boston was working at the job site in the few minutes before the accident, he actually saw the single-cylinder mechanism under the truck and realized that if the liftgate should malfunction the 1050–pound metal platform might free fall because of the lack of a second cylinder or other effective safety device.[7] Indeed, as a matter of law, Boston's brief opportunity to see the single-cylinder design of the liftgate was insufficient to establish an assumption of risk defense. It did not present him with a condition so "open and obvious" as to create a fact issue as to whether he knew of the existence of the defect—i.e., the lack of an effective back-up safety system—and of the danger it presented.

There was evidence from which the presence of warning decals on the liftgate could be inferred, but this too was insufficient to establish an assumption of risk defense. At both trials, Boston acknowledged that on the rear of the liftgate, there was a decal that stated "[s]tand clear while lowering and raising gate." This decal failed to give any warning of the specific defect or of the danger it created. At the first trial, Warner–Fruehauf did not present evidence showing that a second type of decal was, as a matter of routine business practice, placed on every liftgate. At the second trial, there was evidence from which one could infer that a second warning decal was affixed to the liftgate. Only the last few of the 189 words of the second decal, however, contained even a vague indication of a defect and possible danger—"[t]he lift is not equipped with a backup system to prevent falling in the event of a failure". We agree with the trial judge's observation that the jury would have had to engage in speculation to conclude that Boston saw this decal and read the warning at the end of it. Mr. Boston and a co-worker

---

6. The relevant part of the instruction states:
    If you find from all of the evidence that plaintiff had *knowledge of specific dangers arising out of the precise defects claimed in the case* and that (s)he voluntarily and unreasonably *proceeded to encounter those dangers despite his/her awareness of such defects*, then you should find in favor of the defendant.
    *Id.* (emphasis added).

7. The plaintiff's failure to discover the defect or failure to protect himself against the possibility of injury is not assumption of risk and is more akin to contributory negligence which is not a defense in strict liability cases. *Payne, supra*, 486 A.2d at 721–22 n. 9; *see also* RESTATEMENT, *supra*, § 402A cmt. n.

testified that they had no recollection of seeing that decal on the liftgate on the day of the accident, and there was no evidence PEPCO had ever told either of them about the defect or the danger created by it.

Thus, the evidence as presented at both trials was insufficient to support a finding that Boston had *either* actual knowledge of the specific defect in question (the absence of a second cylinder or other effective safety device) *or* of the danger created by the defect (the possibility of a sudden fall of the liftgate)—both of which are required to establish an assumption of risk defense in a strict liability action.

■ Therefore, the trial judge's decision to set aside the original verdict and order a new trial because he had erred in giving the standard assumption of risk jury instruction was correct and is affirmed. And even though we view the evidence in the light most favorable to Warner Fruehauf and must accord Warner Fruehauf the benefit of all reasonable inferences to be drawn from the evidence, the trial judge's conclusion during the second trial that no reasonable juror could find by a preponderance of the evidence that Mr. Boston assumed the risk that caused his injury is supported by the record.[8]

Thus, the directed verdict on the assumption of risk issue at the second trial must also be affirmed.

*(C) Defective and Unreasonably Dangerous Condition*

■ To establish strict liability in tort, a plaintiff must establish that the defendant sold the product in question in a defective and unreasonably dangerous condition. In design defect cases, most jurisdictions decide this issue by applying some form of a risk-utility balancing test. AM LAW PROD LIAB 3D at § 28:11. We follow that approach in this case.[9]

■ In general, the plaintiff must "show the risks, costs and benefits of the product in question and alternative designs", and "that the magnitude of the danger from the product outweighed the costs of avoiding the danger". *Hull v. Eaton Corp.,* 263 U.S.App.D.C. 311, 317, 825 F.2d 448, 453 (D.C.Cir.1987) (design defect case, looking to Maryland law in the absence of D.C. case law "clearly setting out the necessary elements of a D.C. strict liability claim");[10] *see also* AM LAW PROD LIAB 3D at § 28:12–15 (general discus-

---

**8.** In reviewing the grant of a motion for directed verdict, this court "must view the evidence in the light most favorable to the non-moving party, who must be given the benefit of all reasonable inferences to be drawn from the evidence." *District of Columbia v. Evans,* 644 A.2d 1008, 1019 (D.C.1994) (citations omitted). This is the same standard that must be applied by the trial court. *See, e.g., Pazmino v. WMATA,* 638 A.2d 677, 678 (D.C.1994). When conflicting inferences from the evidence are possible or where there is room for differences of opinion, the trial judge must allow the case to go to the jury. *Id.* ("A directed verdict is proper *only if* there is no evidentiary foundation ... by which a reasonable juror could find for the party opposing the motion") (emphasis added). Even where it appears to the trial judge that the evidence is such that one party is entitled to prevail on a factual issue, if a contrary result is even possible the better course of action is to allow the issue to go to the jury and then, if necessary, enter a judgment notwithstanding the verdict.

**9.** Another test frequently used in *design defect* cases is the consumer expectation test: a product is unreasonably dangerous when it fails to perform in the manner reasonably to be expected by the ordinary consumer. *See, e.g., Taylor v. Gerry's Rigewood, Inc.,* 141 Ill.App.3d 780, 95 Ill.

Dec. 895, 899, 490 N.E.2d 987, 991 (1986). Many jurisdictions do not view the risk-utility test and the consumer expectation test as mutually exclusive, but as alternative tests. *See, e.g., Simpson v. Standard Container Co.,* 72 Md.App. 199, 527 A.2d 1337 (1987); *State Farm Fire & Casualty Co. v. Chrysler Corp.,* 37 Ohio St.3d 1, 523 N.E.2d 489 (1988); *Dewey v. Brown & Williamson Tobacco Corp.,* 225 N.J.Super. 375, 542 A.2d 919 (1988); *Lamkin v. Towner,* 246 Ill. App.3d 201, 186 Ill.Dec. 151, 615 N.E.2d 1208 (1993). Given the type of product involved in this case, a risk-utility analysis is more appropriate than one which focuses on the expectations of an ordinary consumer. The Bostons presented the evidence necessary for an effective risk-utility analysis.

**10.** The D.C. Circuit's perception in *Hull* of a lack of clarity in our cases regarding the elements of strict liability was attributed to the contrast between the majority opinion in *Fisher v. Sibley Memorial Hosp.,* 403 A.2d 1130, 1133 n. 8 (D.C. 1979) on the one hand, and the concurrence in that case, *id.* at 1134, and *Payne, supra,* 486 A.2d at 722, on the other. *Hull* did not cite *Berman, supra.*

sion of the risk-utility test).[11] There are many different factors that may be considered by the jury in applying a risk-utility analysis.[12] In order to weigh properly the interests of manufacturers (or distributors), consumers, and the public, the risk-utility analysis must be applied in a flexible manner that is necessarily case specific. *See, e.g., O'Brien v. Muskin Corp., supra,* 94 N.J. 169, 463 A.2d 298, 305 (1983).[13]

In the context of this case, the risk side of the equation is comprised of the danger of death or serious injury presented by the use of a single-cylinder liftgate with no safety backup, less the extent to which that danger might have been reduced by the warning decals routinely placed on the liftgates. On the other side of the balance is the availability of commercially feasible design alternatives, a factor which indicates the utility or benefit derived from marketing the product with the design at issue in this case.

The risk of bodily injury presented by the design of the single-cylinder liftgate was serious. The evidence presented by the Bostons reveals that: (1) over half of the Anthony single-cylinder liftgates in PEPCO's fleet had reportedly experienced identical free falls;[14] (2) tests observed by PEPCO's Safety Committee Chairman comparing Anthony single-cylinder liftgates to similar liftgates with two cylinders showed that single-cylinder liftgates would fall free in the event of a mechanical failure, but that dual-cylinder liftgates would not; (3) tests conducted after Boston's injury by PEPCO's Maintenance Superintendent showed upon a mechanical failure the liftgate involved in Boston's accident fell several times while being operated normally; and (4) the liftgate's warning decal and instructions manual—both stating that "[t]he lift is not equipped with a back-up system to prevent falling in the event of a failure"—indicate the serious risks presented

11. After the plaintiff satisfies the *prima facie* burden of production, the burden then shifts to the defendant to show that the benefits of the design outweigh its risks. *See, e.g., Taggart v. Richards Medical Co.,* 677 F.Supp. 1102 (D.Colo.1988) (discussing the defendant's burden under the risk-utility test).

12. For example, under New Jersey case law, some of the factors relevant to a risk-utility analysis are:
(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
(3) The availability of a substitute product which would meet the same need and not be as unsafe.
(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
(5) The user's ability to avoid danger by the exercise of care in the use of the product.
(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.
*O'Brien v. Muskin Corp.,* 94 N.J. 169, 463 A.2d 298, 304–05 (1983) (citation omitted) (claim of defective design brought against swimming pool

manufacturer). *See Ziegler v. Kawasaki Heavy Indus., Ltd.,* 74 Md.App. 613, 539 A.2d 701, 706–07 (1988) (claim of defective design brought against motorcycle manufacturer, where court sets forth same factors listed in *O'Brien, supra* ).

13. In a strict liability case, the focus is on the product itself (i.e., whether the product as designed was reasonably safe in light of the risks, costs, and benefits) and not on the manufacturer's conduct. *See, e.g., O'Brien v. Muskin, supra,* 463 A.2d at 303–04; *Carter v. Johns–Manville Sales Corp.,* 557 F.Supp. 1317, 1318 (E.D.Tex. 1983) (claim of failure to warn and claim of defective design brought against manufacturer of insulation products containing asbestos). Thus, even though the same factors can be considered in a negligent design case, the application of these factors is very different. *Id.* at 1319; *see also Hull v. Eaton Corp., supra,* 263 U.S.App.D.C. at 316–17, 825 F.2d at 453–54 (same factors are applied differently to negligence and strict liability claims); *id.* at 318, 825 F.2d at 455 (summary judgment for manufacturer in design defect case is upheld based on both strict liability and negligence theories). However, the reasonableness of the manufacturer's act of placing the product as designed on the market is determined by the risk-utility analysis. *See, e.g., O'Brien v. Muskin, supra,* 463 A.2d at 305.

14. PEPCO's Safety Committee investigation of several complaints revealed that of the eleven PEPCO trucks with Anthony single cylinder liftgates, seven had identical free falls, four of which involved serious personal injuries, including Boston's injuries.

by the design of the Anthony single-cylinder liftgate.[15]

Under a risk-utility analysis, "[a] manufacturer [or distributor] is entitled to defend a strict liability claim based on defective design by showing that a warning accompanied the product that reduced its dangers." *Carter v. Johns–Manville, supra,* 557 F.Supp. at 1320. However, while the adequacy of a warning is relevant and may even tip the balance in the decision whether a product is or is not defectively designed, it is *not* the sole consideration: "A warning is *only one* of a product's many design attributes that weigh in the balance of dangers against utility ... but *could be* a pivotal design attribute in a particular case." *Id.* (emphasis added).

There is some inconsistency among the authorities concerning the effectiveness of warnings in various factual scenarios.[16] However, we do not have to resolve the issues those authorities raise, because the warning decals in this case were inadequate as a matter of law. As indicated above, one of the warning decals was inadequate because the jury would have had to engage in conjecture to have concluded that it was in a location where Boston could have seen it, and because it consisted of 189 words only the last few of which contained the vague warning of possible danger quoted above.[17] The other decal—"[s]tand clear while lowering and raising the gate"—did not provide any

warning of the specific defect alleged or of the danger created by it.[18]

Turning to the other side of the scale, we must determine, based upon the record before us, whether the utility or benefit realized from marketing the liftgate with the design at issue outweighed any risks presented by that particular design. In order to determine whether a safer design that would have prevented the injury should have been used, the trier of fact ordinarily must consider whether any safer alternative designs were commercially feasible. In determining the feasibility of design alternatives the trier of fact should consider the "financial cost of the alternative" as well as any "adverse consequences" created by the alternative. Am Law Prod Liab 3D at § 28:14.

The Bostons presented uncontradicted expert testimony that the liftgate, as designed, was "unreasonably dangerous." Both the Bostons' mechanical engineering expert, James Kita, and Warner Fruehauf's mechanical engineering expert, Roger Link,[19] testified that alternative designs that would have prevented the metal platform from a free fall were available when the Anthony A–146 single-cylinder liftgate was manufactured in the mid–1970s. These alternative designs included dual-cylinder and multi-cylinder configurations, as well as the inclusion of a limit

15. *See also* discussion on the expert testimony presented by the Bostons, *supra,* at 17–18.

16. *See, e.g., Eads v. R.D. Werner Co.,* 109 Nev. 113, 847 P.2d 1370 (1993) (manufacturer may be liable for defective design, including but not limited to absence of safety device, notwithstanding adequate warning for safe use, if there was commercially feasible design alternative available when product was manufactured that probably would have prevented accident); *Robinson v. G.G.C., Inc.,* 107 Nev. 135, 808 P.2d 522 (1991) (same); *Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652 (1st Cir.1981) (applying New Hampshire law) (where danger was obvious because of warning affixed to product, manufacturer may still be liable if unreasonable danger could have been eliminated without excessive cost or loss of product efficiency); *but see Simpson v. Standard Container Co., supra,* 527 A.2d at 1341 (where manufacturer provides adequate warnings for safe use, product is neither defective nor unreasonably dangerous); *Taylor v.*

*Yale & Towne Mfg. Co.,* 36 Ohio App.3d 62, 520 N.E.2d 1375 (1987) (strict products liability action based upon design defect must fail where alleged defect is lack of label warning of obvious propensity of product).

17. This warning decal was only 5 × 7 (according to appellees) or 4 × 6 (according to appellants)— exceedingly small given its wordiness.

18. We do not have to address appellant's contentions concerning material alteration—whether or not the warning labels were actually affixed at the time of the accident—because even assuming that they were affixed, they did not effectively warn expected users of the defect and the danger it presented.

19. Though Warner Fruehauf designated Roger Link as its engineering expert, Warner Fruehauf did not call him as a witness. Only the Bostons called Mr. Link to testify.

switch on the latching mechanism of the lift-gate.[20]

The Chairman of PEPCO's Safety Committee, Fred Lawless, testified that the committee had investigated six incidents in which Anthony single-cylinder liftgates "[fell] from a near-vertical folded position to the ground creating a hazard." He explained that he had observed tests demonstrating that, in the event of the failure of the locking or hooking mechanism, a single-cylinder liftgate would fall "in a split second with no warning." In the case of a similar failure, however, a dual-cylinder liftgate would "creep [down] very slowly." According to Mr. Kita's cost-benefit analysis, any one of the above alternatives was available at nominal additional cost to appellant, would have caused no reduction in the liftgate's overall utility, and would have prevented the metal platform from falling free. Principally on the basis of these factors, Mr. Kita ultimately opined within a reasonable degree of engineering certainty that the liftgate as designed was defective and unreasonably dangerous.

By contrast, Warner Fruehauf failed to offer any expert or even lay testimony to substantiate its general assertion that the liftgate as designed was safe for its intended use and was therefore neither defective nor unreasonably dangerous. Moreover, Warner Fruehauf failed to impeach or contradict any of the statements or opinions expressed by either Mr. Link or Mr. Kita. The only question that Warner Fruehauf's counsel asked Mr. Link during cross-examination related to the payment of his expenses. Warner Fruehauf's cross-examination of Mr. Kita focused on PEPCO's maintenance of the liftgate.[21] Moreover, Warner Fruehauf failed to offer any evidence showing any benefit gained by

marketing a single-cylinder liftgate that outweighed the risk of death or serious bodily harm inherent in this particular design.

■ Although directed verdicts are granted sparingly in favor of the party who has the burden of proof, we recognize that "to the extent that the party with the burden of proof has established his case by testimony that the jury is not at liberty to disbelieve, a verdict may be directed for him...." *See* 9 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 2534, at 590–91 (1971). The standard to be applied in considering a motion for directed verdict by a party who has the burden on one issue is similar to the standard applied when considering such a motion made against that party. The court must consider whether reasonable jurors could differ. *Id.* at 592.[22] The application of the standard is different in practice, however:

> Yet though a motion for directed verdict in favor of the proponent of an issue is cast in the same form as when made by the defending party, it requires the judge to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect. He must be able to say not only that there is sufficient evidence to support the finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding.

*Mihalchak v. American Dredging Co.,* 266 F.2d 875, 877 (3rd Cir.1959).

In *Hurd v. American Hoist & Derrick Co.,* 734 F.2d 495 (10th Cir.1984), the court upheld a directed verdict granted in favor of

---

**20.** Warner Fruehauf's main witness of the second trial, sales manager James Baikauskas, also testified that the dual-cylinder design was available in the 1970s.

**21.** On appeal, Warner Fruehauf argues that the trial court erred in barring on relevancy grounds its attempt to cross-examine one of Bostons' witnesses concerning PEPCO's maintenance practices at times considerably prior to the accident in order to establish an intervening cause. The ruling was well within the court's discretion. Moreover, Warner Fruehauf did not succeed in raising an issue as to whether PEPCO's maintenance practices resulted in the truck's being used

with a liftgate that had damaged safety latches. Had it done so, it would have been faced with Mr. Kita's unrebutted testimony that a manufacturer must reasonably anticipate that the hook latch mechanism may not achieve positive locking for any of a variety of causes and for that reason the manufacturer must include in its design a back-up safety system.

**22.** *Cf. Mitchell v. David,* 51 A.2d 375, 377 (D.C. 1947) ("The test to be applied to a motion for a directed verdict at the conclusion of defendant's opening statement is the same as that applicable to a similar motion made by defendant at the close of plaintiff's opening statement").

the plaintiff as to liability in a products liability action against a manufacturer. Specifically, the court held that when expert testimony establishing that a product is defectively designed and unreasonably dangerous is "uncontradicted, unimpeached, and not discredited by cross-examination[, it] must be taken as true." *Hurd, supra,* 734 F.2d at 500. As in this case, the plaintiff offered expert testimony that a design defect caused the injury. The manufacturer in *Hurd* offered no evidence to refute plaintiff's expert testimony, nor did the manufacturer's attorney weaken the force of plaintiff's experts' testimony by cross-examination. *Id.*[23] In ruling as it did, the court observed that a directed verdict may be granted in favor of the party with the burden of proof "only if the evidence is such that without weighing the credibility of the witnesses the only reasonable conclusion is in his favor." *Id.* at 499.

In *Dmitrieff v. Campbell,* 234 A.2d 808 (D.C.1967), this court upheld a verdict directed in favor of a plaintiff in a contract action. While noting that a trial court is usually reluctant to direct a verdict in favor of a party bearing the burden of proof, the court pointed out that the appellant did not contradict any of the factual showings supporting the claim of breach, and stated: "[W]here the evidence of a party to the action is not contradicted by any direct evidence or by any legitimate inferences therefrom and where the evidence is not improbable, impossible, or subject to suspicion, there is no valid basis for denying its conclusiveness." *Id.* at 810. The court quoted with apparent approval the trial judge's observation that even granting appellant every reasonable inference, he would have had to set aside any verdict a jury might return for defendant.

In *Service Auto Supply Co. v. Harte & Co., Inc.,* 533 F.2d 23 (1st Cir.1976), the president of the defendant corporation had testified concerning the transactions that underlay the claim of breach of contract. Though the appellate court reminded the trial court that it is generally preferable to submit to the jury cases with apparently conflicting testimony, it scrutinized the president's testimony and concluded that it did not contradict the plaintiff's evidence on liability and that a jury therefore could not reasonably have found for the defendant on that issue.

In this case, the evidence overwhelmingly supported the Bostons, even on issues as to which they bore the burden of persuasion. Given the danger presented by the design of the liftgate, the ineffectiveness of the warning of that danger, and the uncontradicted expert testimony that safer alternative designs providing the same utility were both economically and technologically feasible, we find no error in the trial judge's conclusion that, as a matter of law, the liftgate was defectively designed and unreasonably dangerous. Warner Fruehauf, like the manufacturer in *Hurd,* failed to refute the Bostons' expert testimony or to neutralize it by cross-examination. Under the circumstances, appellees' expert testimony establishing that the liftgate was defectively designed and unreasonably dangerous "must be taken as true". Therefore, not only did the trial court conclude correctly that, as a matter of law, Warner Fruehauf had failed establish William Boston's assumption of the risk, it also decided correctly that the Bostons were entitled to a directed verdict on the issue of liability. Accordingly, the judgment is

*Affirmed.*

---

23. The manufacturer in *Hurd* offered no evidence and rested after the close of the plaintiff's evidence. *Id.* at 497. The manufacture's sole defense during trial was that it could not be liable as a successor corporation. *Id.* at 498 n.

2. On appeal the manufacturer did not renew this argument but instead argued that the directed verdict was improperly granted because issues of fact existed. *Id.*