**Roger ARTIS, Appellant,**

v.

**CORONA CORPORATION OF JAPAN, et al., Appellee.**

No. 96–CV–329.

District of Columbia Court of Appeals.

Argued Sept. 9, 1997.
Decided Nov. 26, 1997.

J. Philip Kessel, with whom Jack A. Gold, Bethesda, MD, was on the brief, for appellant.

Gerald F. Ivey, with whom Rebecca Nassab, Washington, DC, was on the brief, for appellee.

Before KING, REID and EILPERIN,* Associate Judges.

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1995).

1. In a negligence action involving product liability, a plaintiff must prove the standard of care owed by the manufacturer to the consumer. We

REID, Associate Judge:

Appellant Roger Artis filed a complaint against appellee Corona Corporation of Japan and others ("Corona"), alleging negligence, strict liability and breach of warranties after a kerosene heater flared up and caused severe burns to his body. The trial judge granted summary judgment in behalf of Corona on the ground that Mr. Artis failed to demonstrate that an alternative design was commercially available and/or feasible at the time the heater was manufactured. We remand the case to the trial court for further proceedings consistent with this opinion.

## FACTUAL SUMMARY

Mr. Artis purchased a portable Corona SX–2E kerosene heater in January 1992, from the Ames Department Store and placed it in the kitchen of his residence. The heater was designed, manufactured and assembled in Japan by the Corona Corporation of Japan, and distributed in the United States by the Corona U.S.A. Corporation. Mr. Artis used the heater three or four times without incident. However, he experienced trouble with the heater on March 12, 1992. In the early morning hours of that day, he lit the heater which appeared, initially, to burn normally. He then left the kitchen and when he returned, he noticed that the heater was burning abnormally with reddish flames fluctuating in height. He turned the heater off, but after approximately twenty seconds, he saw flames coming from beneath the heater. As he attempted to remove the heater from his home, he was engulfed in flames. He sustained second and third degree burns to more than eleven percent of his body, including his face, hands, legs and right foot.

Mr. Artis filed a complaint on November 8, 1993, against the Corona Corporation and others, alleging *inter alia*, negligence and strict liability.[1] He argued, in essence, that

described that standard in *Westinghouse Elec. Corp. v. Nutt,* 407 A.2d 606 (D.C.1979):

the manufacturer of a chattel will be liable for "injuries to others expected to use the chattel when the injuries are caused by the lack of reasonable care in adopting a safe plan or

Corona knew or should have known, based upon historic data, "that the princip[al] cause of flare-up and uncontrolled fire associated with portable kerosene heaters is the use of gasoline or other high volatility fuel" and thus the company should have used a commercially feasible alternative design to prevent such flare-ups. He attempted to sustain his burden of proof with respect to his negligence and strict liability causes of action by demonstrating that Corona failed to use reasonable care by adopting a safe design to prevent flare-ups, and that it sold the kerosene heater in a defective and unreasonably dangerous condition. In that regard, he sought to show through Dr. Richard W. Henderson, one of his experts, alternative designs that were commercially feasible at the time the Corona SX–2E was manufactured.

In his May 30, 1995, Super. Ct. Civ. R. 26(b)(4) statement, Mr. Artis identified his experts, including Dr. Henderson, and set forth modifications that Corona could have made at the time of manufacture to produce a safer product. Included in these modifications was one relating to a "shutoff mechanism"; another concerning "a fuel containment system"; and a third regarding "a thermal barrier between the removable tank and the heat of the combustion process." Dr. Henderson gave deposition testimony in June and December 1995 in which he focused on the modifications. He stated that to avoid flare-ups, the thermal barrier system could have been installed to control and re-

duce temperatures in the storage tank by redirecting the flow of hot air. Dr. Henderson maintained that the cost of the thermal barrier system, involving "pieces of sheet metal and a design for air flow," would be "no more than maybe $10 per unit once you're in production." Between June and December 1995, Dr. Henderson developed and tested six thermal barrier designs. During the testing of each of these designs, which ranged from 171 to 303 hours over several weeks, no flare-ups occurred.

Corona's theory was that the kerosene heater was not defectively designed. Rather, the cause of Mr. Artis's injuries was the use of gasoline in the heater despite contrary warnings which appeared in decals on the heater.[2] Corona maintained that Mr. Artis refueled the kerosene tank three times with gasoline prior to his accident, rather than with untainted kerosene.[3] In response to Mr. Artis's expert's testimony Corona argued that neither the automatic shutoff system, nor the overflow tank system had demonstrated a capacity to prevent gasoline flare-ups. Moreover, Corona took issue with any presentation of Dr. Henderson's testimony concerning the thermal barrier system.

On January 3, 1996, Corona moved to strike the testimony of Dr. Henderson, and also sought summary judgment in its favor. Corona argued that

the inspection of Dr. Richard W. Henderson's test facility on December 5,

---

design" ... What constitutes "reasonable care" will vary with the circumstances, and involves "a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of precaution which would be effective to avoid the harm."

*Id.* at 610 (citations omitted). With respect to a strict liability case, we have said that: "a plaintiff must establish that the defendant sold the product in question in a defective and unreasonably dangerous condition." *Warner Fruehauf Trailer Co. v. Boston,* 654 A.2d 1272, 1276 (D.C. 1995). "In general, the plaintiff must 'show the risks, costs and benefits of the product in question and alternative designs', and 'that the magnitude of the danger from the product outweighed the costs of avoiding the danger'". *Id.* (citations omitted).

2. Decals affixed to the kerosene heater stated, for example, "[u]se of even small amounts of volatile

fluids such as gasoline can cause uncontrolled fire" and "[n]ever use gasoline, only uncontaminated 1–K kerosene."

3. With respect to his alleged use of gasoline in the kerosene heater, Mr. Artis stated in a footnote in his appellate brief:

Prior to the motion which forms the basis of this appeal, Defendants/Appellees moved for summary judgment alleging, *inter alia,* that Mr. Artis deliberately used gasoline to fuel his kerosene heater and that his claims were barred, as a matter of law, by his assumption of the risk.... This motion was denied by order dated July 14, 1995.... The Order was not appealed.

Mr. Artis also acknowledged that gas chromatography tests, which his expert conducted on samples taken after the accident from his kerosene heater, had traces of gasoline.

1995 revealed that the overflow system, which he has touted throughout the case as the solution to gasoline-induced flare-ups in a kerosene heater, was not a finalized design change nor was it operational.... Because no functioning prototype of the overflow unit exists, Dr. Henderson should not be permitted to testify in this case on issues of design defect.

Because Mr. Artis could not present testimony regarding "a technologically achieved alternative" or a defect in the kerosene heater, Corona contended, summary judgment was appropriate. Corona acknowledged that Dr. Henderson had shifted his focus to another alternative feasible design, the thermal barrier, but maintained in its motion that Mr. Artis should not be able to rely upon that alternative because he "deliberately withheld disclosure of the fact that the theory of design alternative completely changed until less than twenty-four hours before the product inspection in South Carolina."

Mr. Artis denied that Dr. Henderson had misled Corona or misrepresented his work on alternative feasible designs. Furthermore, Mr. Artis asserted, because there are general issues of material fact involved in this case, summary judgment would be inappropriate.

The trial court granted the motion for summary judgment in Corona's favor. It also denied as moot Mr. Artis's motion to supplement his exhibit list with pictures or drawings of the thermal barrier design. Although the trial court recognized that whether any of the alternative design systems is operational is a factual issue, it stated, "the factual issue of whether Dr. Henderson's prototypes are operational carries no significance if, as a matter of law, the prototypes do not qualify as 'alternative feasible designs.' " In explaining that Dr. Henderson's designs did not qualify as alternative feasible designs, the trial court said:

The Court has not found, nor had brought to its attention, any authority which would support admission of expert testimony on an alternative design that was not *available and/or feasible* at the time of manufacture of the allegedly defectively designed product. Here, no proffer of expert testimony is made as to the availability of a safer alternative design when the Corona SX–2E was first manufactured in 1988, nor even of a safer alternative design available at the time Plaintiff bought and used the Corona kerosene heater in 1992. To date, it appears that there are still no *commercially available* safer alternative designs, even if the prototype could be found feasible. Eight years have passed since the Corona SX–2E was first manufactured and Plaintiff's expert continues to "experiment" with different prototypes. Were even the earliest of Dr. Henderson's prototypes to prove successful, the fact remains that it was developed six years after the Corona SX–2E. *A manufacturer has no duty to keep abreast of developments in its field that are not yet in being.* In the circumstances here, it would be impossible for a reasonable jury to conclude that a safer design would have prevented the injury and should have been used, since no safer alternative designs were commercially feasible.

(emphasis added). Thus, the trial court granted Corona's motion, in part, because it concluded that there were no *commercially available* safer alternatives at the time the Corona SX–2E kerosene heater was manufactured, and that Corona had no obligation to keep up with alternative designs that did not actually exist at the time it manufactured the Corona SX–2E. Mr. Artis filed a timely appeal.

### ANALYSIS

Mr. Artis contends that the trial court erred when it granted Corona's motion for summary judgment on the ground that the alternative designs advanced by his expert did not exist at the time the kerosene heater was designed, manufactured and sold. He claims that the trial court's view of our decision in *Warner Fruehauf Trailer Co. v. Boston,* 654 A.2d 1272 (D.C.1995) is "overly restrictive" and that the trial court misapplied our decision in *Westinghouse Elec. Corp. v. Nutt,* 407 A.2d 606 (D.C.1979). Furthermore, he argues, "based upon the industry's knowledge concerning the frequency of kerosene heater fla[re]-ups, a reasonably prudent manufacturer would have negated this risk through the use of a safer alternative design

which was technologically and economically feasible at that time." He also takes issue with the trial court's determination that an alternative design must be "commercially available" at the time of manufacture.

Corona contends that the feasible design alternative must be available at the time a product is manufactured. Further, Corona argues that the trial court did not confuse "feasibility" and "availability" but "used the terms in the disjunctive." Corona appears to distance itself from the trial court's use of the phrase "commercially available."[4]

Because the trial court may have misapprehended our ruling in *Warner, supra*, and may have confounded the concepts of "commercially available" and "commercially feasible", we reverse and remand this matter to the trial court for further proceedings consistent with this opinion.

In *Warner*, a liftgate used to remove heavy objects from a truck suddenly malfunctioned and the liftgate metal platform struck and injured the appellant. He and his wife filed a complaint against the manufacturer and the distributor of the liftgate, alleging strict liability due to defective design and unreasonable dangerousness of the liftgate. We applied a risk-utility approach, saying "the plaintiff must 'show the risks, costs and benefits of the product in question and alternative designs', and 'that the magnitude of the danger from the product outweighed the costs of avoiding the danger[.]'" 654 A.2d at 1276 (quoting *Hull v. Eaton Corp.*, 263 U.S.App. D.C. 311, 317, 825 F.2d 448, 453 (D.C.Cir. 1987)) (other citations omitted). While "risk" focuses in part on the danger of the product,

the "utility" concerns "commercially feasible design alternatives." *Id.* at 1277.

Here, the trial court interpreted *Warner* as saying that there must be "commercially available" as well as "commercially feasible" alternative designs at the time the product is manufactured.[5] It is true that we referred to the "availability of commercially feasible design alternatives" in *Warner*. However, our focus was on "commercially feasible" or "economically and technologically feasible" designs that could have been developed and used at the time of the liftgate's manufacture. *Id.* at 1278 n. 16. One of the cases we relied on in stressing commercially feasible design alternatives was *Robinson v. G.G.C., Inc.*, 107 Nev. 135, 808 P.2d 522 (1991). In *Robinson*, the court emphasized what "could reasonably and economically [have been] done" at the time the product was manufactured, not what was "commercially available" at the time. "The question is not whether anyone else was doing more, although that may be considered, but whether the evidence discloses that anything more could reasonably and economically be done." 808 P.2d at 527. Accordingly, *Warner* must be read as requiring that the safer alternative design be commercially feasible, not that it be commercially available. In short, a safer alternative design may have been economically and technologically feasible at the time of the product's manufacture, but it may not have been commercially available. All that is required is that it be commercially feasible at the time of manufacture.[6]

In *Boatland of Houston, Inc. v. Bailey*, the court discussed feasibility in the context of

**4.** Corona makes other arguments which require the resolution of factual issues, such as whether the overflow tank system qualified as an alternative feasible design. Given our disposition of this matter, we take no position on these arguments.

**5.** The trial court stated:

> The Court has not found, nor had brought to its attention, any authority which would support admission of expert testimony on an alternative design that was not available and/or feasible at the time of manufacture of the allegedly defectively designed product. Here, no proffer of expert testimony is made as to the availability of a safer alternative design when the Corona SX–2E was first manufactured in 1988, nor even of a safer alternative design available at the time the Plaintiff bought and

used the Corona kerosene heater in 1992. To date, it appears that there are still no commercially available safer alternative designs, even if the prototype could be found feasible.... A manufacturer has no duty to keep abreast of developments in its field that are not yet in being.

**6.** *See also Dartez v. Fibreboard Corp.*, 765 F.2d 456, 463 (5th Cir.1985) ("the state of the art is defined in terms of what the industry as a whole knew or could have discovered by properly fulfilling their duty to test these products"). In *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 748 (Tex.1980), the court explained "state of the art":

> The state of the art with respect to a particular product refers to the technological environ-

actual use, and in terms of the capacity to design or produce a safer alternative at the time of manufacture:

A plaintiff may advance the argument that a safer alternative was feasible with evidence that it was in actual use or was available at the time of manufacture. Feasibility may also be shown with evidence of the scientific and economic capacity to develop the safer alternative.

. . . .

... Even if a safer alternative was not being used, evidence that it was available, known about, or capable of being developed is relevant in terms of its feasibility.

609 S.W.2d 743, 746, 748 (Tex.1980). *See also Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 62 (Tex.1983). Thus, Mr. Artis may show through expert testimony that a safer alternative design was commercially feasible, that it was in actual use, known about, or was capable of being developed in terms of cost and technology at the time the kerosene heater was manufactured.

In short, the trial court applied too stringent a test for what qualifies as an alternative feasible design by focusing on when Dr. Henderson developed his designs—several years after manufacture—rather than on what a competent manufacturer reasonably could have developed at the time the Corona SX-2E was manufactured and sold. Moreover, the trial court misapprehended the risk-utility balancing test applied by this court. *See Warner, supra,* 654 A.2d at 1276–77.

On the record before us, excerpts from Dr. Henderson's testimony regarding the thermal barrier system arguably were sufficient to defeat summary judgment. However, the trial court concluded that even if Dr. Henderson's testimony is taken into consideration, it could not establish an alternative feasible design.[7] This was error because an incorrect legal standard was applied. On remand, the trial court must apply the correct legal standard and, in doing so, determine whether the record reveals the existence of genuine issues as to material facts which must be resolved before a final determination can be made in this matter.[8] *See Fred Ezra Co. v. Psychiatric Inst. of Washington, D.C., et al.,* 687 A.2d 587, 591 (D.C. 1996).

Accordingly, for the foregoing reasons, we are constrained to reverse and remand this matter to the trial court for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

ment at the time of its manufacture. This technological environment includes the scientific knowledge, economic feasibility, and the practicalities of implementation when the product was manufactured.

In *Owens–Corning Fiberglas Corp. v. Henkel,* 689 A.2d 1224 (D.C.1997), a products' liability case concerning knowledge of dangers of asbestos, we followed *Dartez, supra,* in determining that state of the art evidence could be admitted as to whether the risks of asbestos were "scientifically discoverable" at the time of manufacture. *Id.* at 1229, 1230 n. 10.

**7.** In a footnote to its memorandum order, the trial court stated:

Defendants devote considerable effort to precluding Plaintiff's expert from testifying on the basis of their "eleventh hour" discovery that Dr. Henderson "abandoned" the "overflow" system and now proposes to introduce the "thermal barrier" system as an alternative feasible design. Because summary judgment is entered in Defendants' favor on other grounds, it is not necessary to reach this argument.

**8.** We take no position on whether Dr. Henderson's testimony could be excluded on the grounds argued for by Corona, or whether Artis's motion to supplement the exhibit list and the witness list should be granted.