Achilles G. PAPPAS, et ux., Plaintiffs,

v.

**FORD MOTOR COMPANY,**
et al., Defendants.

Civil Action No. 96–1691 (JHG/PJA)

United States District Court,
District of Columbia.

April 16, 1998.

Boothe, L.L.P., McLean, VA, Paul F. Strain, Venable, Baetjer, Howard & Civiletti, L.L.P., Washington, DC, John A. McCauley, Nenable, Baetjer & Howard, L.L.P., Baltimore, MD, for Hill & Sanders Ford, Incorporated.

### MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This personal injury lawsuit arises out of an automobile accident that occurred in the District of Columbia. Pending are defendants'—Ford Motor Company and Hill & Sanders Ford (collectively "Ford")—motion for summary judgment, plaintiffs' motion to file a surreply, and plaintiffs' motion to exclude certain of Ford's testing evidence. For the reasons stated below, plaintiffs' motions will be granted, and Ford's motion will be denied.

### BACKGROUND

The following facts are not in dispute. On a midsummer's evening, July 24, 1993, plaintiff Achilles Pappas ("Pappas") found himself unable to start his pickup truck, which he had parked on the 1000 block of 6th Street N.E., Washington, D.C. A Good Samaritan, Rufus Jones ("Jones"), attempted to aid Pappas in trying to jump-start the truck. That effort failed, and while Pappas continued inspecting his truck, Jones parked his 1980 Ford Fairmont Futura one car-length in front of Pappas's truck and returned to speak with Pappas. Jones had not set the parking brake and had left the motor running. The 1000 block of 6th Street slopes from north to south. Jones had parked his car to the north of Pappas's truck. As Pappas continued to work on his truck, the two men conversed for at least two minutes. Suddenly, the Fairmont began moving in reverse, crushing Pappas's leg between the rear bumper of the Fairmont and the front bumper of his pickup truck. As a consequence of the accident, Pappas's lower right leg had to be amputated.

On two occasions during the summer of 1994—before this lawsuit was filed—counsel for Pappas conducted a videotaped interview of Jones concerning the incident. Describing his actions before getting out of the car, Jones stated that he was certain that he had

---

Charles Clinton Parsons, Charles C. Parsons & Associates, Chartered, Washington, DC, Russell D. Carson, Tulsa, OK, for Achilles G. Pappas, Rose K Pappas.

John Foster Anderson, McGuire, Woods, Battle & Boothe, L.L.P., McLean, VA, Paul F. Strain, Venable, Baetjer, Howard & Civiletti, L.L.P., Washington, DC, Donald E. Sharpe, Harold Bruce Dorsey, Piper & Marbury, L.L.P., Baltimore, MD, John Randolph Bibb, Jr., Boult, Cummings & Berry, PLC, Nashville, TN, John A. McCauley, Venable, Baetjer & Howard, L.L.P, Baltimore, MD, for Ford Motor Company.

Sanford Alex Friedman, Brault, Graham, Scott & Brault, Washington, DC, John Foster Anderson, McGuire, Woods, Battle &

placed the car in park, "right on P all the way over on the end" (this statement is hereafter referred to as the "Jones statement"). Jones died shortly after the second interview. Because the interview took place before there was a lawsuit, defendants were not notified that the interview was to take place, and they therefore had no opportunity to cross-examine Jones on the facts stated therein.

Pappas's contention in this lawsuit is that Jones's Fairmont self-shifted into reverse gear and caused his injuries as a result of a defect introduced into the car by defendant Ford Motor Company ("Ford"). Specifically, Pappas alleges that the defective design of the car allows a driver to shift into "illusory park," in which the gearshift is not latched in the "Park" position and in which it is possible for the car to shift in the "Reverse" position. Such an alleged defect is not unheard of in the history of automobile usage. *See, e.g., Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1002 (D.C.Cir.1986) (remanding for determination of whether owners of Ford vehicles alleged to have park-to-reverse problem should be certified as a class); 7 AMERICAN LAW OF PRODUCTS LIABILITY 3d § 95:170 (reviewing cases involving injuries from self-shifting in different model cars).

Ford has filed a motion for summary judgment attacking the sufficiency of plaintiffs' evidence.

## *DISCUSSION*

### A. Summary Judgment Standard

Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). To defeat a motion for summary judgment, the nonmoving party must offer more than mere allegations, *see id.* at 249, 106 S.Ct. at 2510–11, and

has the burden of designating specific facts showing there is a need for trial by the depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The Court's role is limited to determining if a factual controversy exists; resolving factual disputes goes beyond the Court's authority in ruling on a motion for summary judgment. *See Sherwood v. Washington Post,* 871 F.2d 1144, 1147 (D.C.Cir.1989).

### B. Applicable Law

The materiality of any fact in dispute is determined by reference to the legal standards that apply to the cause of action. The parties dispute which line of cases outlines plaintiffs' burden at trial. Although the complaint alleges a number of theories of liability, plaintiffs state in their briefs that they are proceeding on a liability theory for defective design. Pls.' Supp. Response to Def.'s Reply Mem. (hereafter "Pls.' Surreply"). The complaint alleges theories of strict liability for a design defect and negligent design.

#### 1. Strict Liability

Under District of Columbia law, to prove that Ford is strictly liable for a park-to-reverse design defect, plaintiffs must show that: (1) the seller was engaged in the business of selling the product that caused the harm; (2) the product was sold in a defective condition unreasonably dangerous to the consumer or user; (3) the product was one expected to reach the consumer without any substantial change in the condition in which it was sold; and (4) the defect was a direct and proximate cause of plaintiffs' injuries. *See Ferguson v. F.R. Winkler GMBH & Co. KG,* 79 F.3d 1221, 1224 (D.C.Cir.1996).

#### 2. Negligent Design

To prove that the alleged park-to-reverse design defect is the product of Ford's negligence, plaintiffs must show that

> [plaintiffs'] injuries are caused by the lack of reasonable care in adopting a safe plan or design. What constitutes reasonable care will vary with the circumstances, and

involves a balancing of the likelihood of harm, and the gravity of the harm if it happens, against the burden of precaution which would be effective to avoid the harm. *Artis v. Corona Corp.*, 703 A.2d 1214, 1214 n. 1 (D.C.1997).

## C. Ford's Motion for Summary Judgment

In its motion, Ford asserts that plaintiffs lack sufficient evidence to allow a reasonable jury to find that it was more probable than not that the alleged park-to-reverse defect was the cause of Pappas's injuries.

Plaintiffs have two expert witnesses who will testify that Jones's Ford Fairmont was defectively designed, could have been made safer, and that the alleged park-to-reverse defect was a substantial factor in causing Pappas's injury. Ford also has two expert witnesses. They will say that the accident was caused by misadjustments to the transmission system of the Fairmont.

The stage apparently is set for a classic battle of the experts on the causation issue, and summary judgment on causation in a design defect case is generally inappropriate. But, Ford has two arguments as to why it is entitled to judgment at this stage of the proceedings. First, it argues that plaintiffs' case relies on the testimony of their experts—which Ford asks the Court to rule inadmissible at trial. According to Ford, no experts; no case. Second, even if plaintiffs' experts are allowed to testify, their testimony on causation is in equipoise with that of Ford's experts. According to Ford, the best the jury could do is speculate as to the cause of the accident, and speculation cannot sustain a verdict in plaintiffs' favor. Neither argument is persuasive.

### 1. Exclusion of Plaintiffs' Experts

■ Ford argues that the only "evidence" on which plaintiffs' experts rely to support their opinions that a park-to-reverse defect was the cause of the accident is the Jones statement, which Ford claims is inadmissible hearsay. Therefore, Ford asks the Court to deem the Jones statement inadmissible and, after making that determination, to find that plaintiffs' experts' opinions are therefore unreliable and inadmissible. In the alternative, Ford argues that even with the Jones statement, which plaintiffs' experts opine to be inaccurate, their opinions are insufficiently reliable to be helpful to the jury.

As to the admissibility of the Jones statement, there is no need to make that determination now. Ford wants this statement excluded even though its experts rely on it and plaintiffs' experts contest its accuracy by opining that Jones had put the car in "illusory park" rather than latched park. It is difficult to see how this would be hearsay if plaintiffs were to offer the statement, for, according to Ford, it would not be offered for the truth of the matter asserted. Even if it were, there are other routes by which it may be admissible.[1]

The admissibility of the Jones statement is immaterial to the resolution of this motion, however, for even if the statement were inadmissible, plaintiffs' experts rely on enough circumstantial evidence to make their opinions sufficiently reliable to present to the jury. Specifically, they allege that because of the slope of the 1,000 block of 6th Street and because of the delay in time between Jones' exit from the Fairmont and the accident, that the most probable cause of the accident was self-shifting from "park" to "reverse." Ford's reliance on *Paz v. Sherwin–Williams*, 917 F.Supp. 51, 53–54 (D.D.C. 1996), is misplaced. In that case defendant's expert had to disregard two eyewitness accounts as to what occurred. Here, no eyewitness disputes the principal facts on which plaintiffs' experts' rely: the slope of the road and the time interval between Jones' exit and the accident. It is for the jury to determine whether the accident occurred as plaintiffs' experts opine, but their respective opinions are certainly more than mere speculation.

### 2. Competing Expert Opinions Do Not Require the Jury to Speculate

With respect to Ford's argument that the competing expert opinions would require the jury to speculate on causation, Ford relies on

---

1. The Court does not pass at this time on whether the videotaped interview with Jones would qualify as a "deposition" under Rule 32(a)(3)(A) of the Federal Rules of Civil Procedure.

an inapplicable legal standard, and even if that standard applied, plaintiffs' evidence is sufficient. The legal question is whether that defective design was a substantial factor in the accident. Ford's argument is simple:

> [P]laintiffs rely on an affidavit submitted by their expert witness Neil J. Mizen, who declares that the mere fact that the Fairmont rolled backwards on a slightly sloped street after resting stationary for a few minutes means that Jones must have only placed the shift selector in the "illusory park" position he proposes. This evidence is not sufficient under D.C. Circuit law.

Ford Reply Mem. in Supp. of Summ.J. at 3. The Court disagrees.

In its argument, Ford fails to recognize that because its motion is directed toward plaintiffs' case on the causation element, the Court assumes for purposes of this motion that plaintiffs have proven defective design. Taken in the light most favorable to plaintiffs, a showing that Jones's automobile was defectively designed by Ford, combined with the circumstantial evidence on which plaintiffs' experts rely, is sufficient to allow a reasonable jury to find that the defective design was a substantial factor in the accident.

Ford argues that plaintiffs' must introduce evidence sufficient to overcome the alternative causes of the accident that Ford's experts propose. To support the argument, Ford relies on a series of "manufacturing defect" cases from our Court of Appeals interpreting District of Columbia law. *See McFarlane v. Caterpillar, Inc.*, 974 F.2d 176 (D.C.Cir.1992), *Siegel v. Mazda Motor Corp.* ("*Siegel II*"), 878 F.2d 435 (D.C.Cir.1989), *Siegel v. Mazda Motors Corp.* ("*Siegel I*"), 835 F.2d 1475 (D.C.Cir.1987), *Hall v. General Motors Corp.*, 647 F.2d 175 (D.C.Cir.1980), and *Stewart v. Ford Motor Co.*, 553 F.2d 130 (D.C.Cir.1977). This line of cases does not apply to a design defect case.

In a manufacturing defect case, plaintiff may seek to prove either a "specific defect"—that is, that a specific, identifiable part of the car was defective and was the cause of the accident—or a "general defect"—which, more accurately, is an unspecified defect, which plaintiffs ask the finder of fact to infer from the accident itself. *See Siegel II*, 878 F.2d at 437. To prove a specific defect in an automobile case, plaintiffs generally introduce expert testimony based on examination of the accident vehicle. *See, e.g., Siegel I*, 835 F.2d at 1477 (plaintiff's expert opined that minute particles in the steering fluid caused the accident). To prove an unspecified defect, plaintiffs generally introduce circumstantial evidence, and expert opinion based thereon, that some defect attributable to the manufacturer must have been the cause of the accident. *See id.* (plaintiff's alternative theory was an unspecified defect).

An unspecified defect case does not call for rank speculation by the jury *per se*, but to avoid speculation, under the law of the District of Columbia:

> [A] plaintiff [can] establish a manufacturing defect by presenting (1) evidence tending to negate causes for the accident other than a defect in the car, and (2) evidence tending to show that the defendant-manufacturer introduced into the car whatever defect might have existed.... Proof that the product was new would warrant a jury inference that a defect, if there was one, existed at the time the product entered the stream of commerce.

*McFarlane*, 974 F.2d at 179 (internal quotation omitted). Potential confusion arises because this legal standard looks to the cause of the accident to answer both the question of whether there was a defect at all, and, if there was, whether the defect was the cause of the accident. But it is clear that the purpose of requiring plaintiff to introduce evidence tending to negate non-defect-related causes of the accident is to provide the jury with a sufficient basis to infer from the circumstantial evidence concerning the cause of the accident *that there was a defect* in the automobile.

In a design defect case, such as this, the proof is quite different. Evidence as to the defect and the cause of the accident are segregable. Under the District of Columbia's "risk-utility" approach to design defect cases, plaintiffs must first show the "risks, costs and benefits of the product in question

and alternative designs, and that the magnitude of the danger from the product outweighed the costs of avoiding the danger." *Artis,* 703 A.2d at 1214 n. 1 (internal quotations omitted).

Only after plaintiffs have introduced sufficient evidence to get to the jury on the question of whether the product was defective does the cause of the accident arise. The defect must have been a substantial factor in the accident. *Exum v. General Elec. Co.,* 819 F.2d 1158, 1162 (D.C.Cir.1987). As in this case, where the defendant in a design defect case raises an alternative theory for the cause of the accident, such as a material alteration of the product, that is a question for the jury. *See Exum v. General Elec. Co.,* 819 F.2d 1158, 1162 (D.C.Cir.1987); *Jiminez v. Dreis & Krump Mfg. Co.,* 736 F.2d 51, 54 (2d Cir.1984) ("the relationship between a substantial alteration to a machine and the causation of the injury is a jury question"); *Berry v. Gibson,* 141 Ill.App.3d 876, 96 Ill.Dec. 219, 491 N.E.2d 33, 35–36 (1986) ("[t]he fact that there is evidence of other causes of an injury ... is like any other controverted issue of fact—a matter to be resolved by the jury"); *see also Knippen v. Ford Motor Co.,* 546 F.2d 993, 1002 (D.C.Cir.1976).

Finally, even if plaintiffs in this case were required to introduce sufficient evidence tending to negate Ford's alternative theory, they have done so. To prove that the Ford Fairmont was in "illusory park" just before it started to roll backward, plaintiffs offer expert testimony recreating the accident scene to prove that the transmission could have been in no other gear. In his affidavit, one of plaintiffs' experts testified that if the car had truly been in park, it could not have made the sudden move backwards. Affidavit of Neil J. Mizen ¶ 11d, Pls. Opp'n Ex. A. If the driver had placed the Fairmont in neutral, it would have started to roll in reverse almost immediately because of the incline of the 1000 block of 6th Street, N.E., on which the truck and automobile rested. *Id.* ¶ 11a. Had the car been in reverse, Jones would not have been able to exit the car without simultaneous movement. *Id.* ¶ 11c. By excluding these possibilities, the expert surmises that the car must have been in illusory park for it to remain stationary for a few minutes before suddenly lurching backwards. *Id.* ¶ 11e.

Ford introduces an alternate theory. Ford's experts assert that after they inspected the Fairmont, they discovered that there were misadjustments in the transmission system of the Fairmont. Deposition of Hugh Mauldin at 44, Defs. Reply Ex. 2. These misadjustments, if existing in the automobile at the time of the accident, would have prevented Mr. Jones from putting the car into full park latch position, even though the gear select indicated that he had. *Id.* According to this theory, the car slipped into powered reverse because the car was left running without setting the parking brake. Any misadjustment in the transmission would not have been the fault of Ford, so defendants should be released from any liability. However, Ford's experts did not examine the transmission until three years after the accident. Between the time of the accident and the inspection by Ford's experts, the Fairmont had been sold to Sam Bolden, who, while performing repairs on the transmission, allegedly broke parts of the transmission in the process. Statement of Sam A. Bolden (sworn), Pls. Surreply Ex. 2. Further, while parked in front of Mr. Bolden's apartment building, an unidentified car collided with the front section of the Fairmont. *Id.* The frontal damage "bent the mounts and the whole power train moved forward," which "changed the geometry of the shift system." Deposition of Frederick King at 37–39, Pls. Surreply Ex. 4. Plaintiffs assert that either of these events may have caused the misadjustments in the transmission and occurred months after the accident which injured him.

Plaintiffs also offer circumstantial evidence that, in February 1993, five months before the accident, the car was inspected by the District of Columbia vehicle inspection division, which would have included an evaluation of the "gear indicator" and transmission adjustment. *See* Defs. Reply Ex. 6. Plaintiffs conclude from this that no misadjustment existed in February 1993. Because no indications were made that the transmission had any trouble or was in any way altered

between February and July 1993, and several events after the accident may have led to the problem identified by Ford's experts, a reasonable juror could find that the adjustment was in proper condition at the time of the Pappas accident.[2]

On summary judgment, this Court is obliged to view the evidence in the light most favorable to the non-moving plaintiffs. Taken in that light—even under the "manufacturing defect" standard on which Ford relies—plaintiffs' evidence suggesting that the parts of the automobile related to the alleged design defect were in their original condition at the time of the accident combined with the circumstantial evidence surrounding the accident is sufficient to allow the jury to rule out Ford's theory without engaging in speculation. *See Stewart v. Ford Motor Co.*, 553 F.2d 130, 138 (D.C.Cir.1977) ("courts have refused to allow a case to go to the jury only in the most egregious instances of failure of proof" tending to negate defendant's alternative theory).

### D. Plaintiff's Motion to Exclude Post–Discovery Testing Evidence

On August 14, 1997, the day before discovery closed, Ford's experts were deposed. Each indicated that he intended to do further testing to support the opinion at which he had already arrived. This statement followed a history of recalcitrance on Ford's part in making its experts and their testimony available to plaintiffs. *See Pappas v. Ford Motor Co.*, Civ. No. 96–1691 (Order of July 15, 1997). On October 17, 1997, plaintiffs filed a motion seeking to exclude "post-discovery deadline engineering analysis, engineering layout testing and any exemplar vehicle testing." Pls.Mem. at 7. The motion is not for exclusion of Ford's expert testimony altogether. Rather, plaintiffs ask that Ford's experts be limited to offering opinions that are supported by testing done before August 15, 1997. In response to plaintiffs' motion, Ford remained silent for *six months*. Then, on March 19, 1998, without seeking

leave to late file, Ford filed an opposition to plaintiffs' motion.

This delay is inexcusable and unexcused. Plaintiffs' motion shall be granted as conceded under Local Rule 108(b). Ford's opposing brief shall be stricken as untimely filed. And, even if the Court were to have reached the merits of Ford's arguments, plaintiffs' motion still would have been granted. The parties shall meet and confer to reach agreement on implementing this Order in a way that minimizes disruption at trial.

### CONCLUSION

Accordingly, upon consideration of the entire record in this matter, it is hereby

**ORDERED** that defendants' motion for summary judgment is DENIED; and it is

**FURTHER ORDERED** that plaintiffs' motion to file a surreply is GRANTED; and it is

**FURTHER ORDERED** that plaintiffs' Motion to Exclude Post-discovery Engineering Dimension Analysis and Testing by Defendants is GRANTED. Ford's opposing brief, labeled "Response to Plaintiffs' Motion To Exclude Any Post–Discovery Deadline Engineering Dimensional Analysis and Testing By Defendants" is hereby STRICKEN as untimely filed. Counsel for the parties shall meet and confer by **May 5, 1998,** to reach agreement on the permissible outlines for the expert testimony of defendants' experts, Frederick W. King and Hugh Mauldin; and it is

**FURTHER ORDERED** that counsel for the parties shall appear in Chambers for a Status Conference/Settlement Conference on **May 13, 1998** at 10:00 a.m.. Counsel shall have full settlement authority, and the parties shall be available for consultation either in the courthouse or by telephone. And it is

**FURTHER ORDERED** that to provide for a more effective settlement discussion, plaintiffs shall file with the Court, and serve on defendants, **not later than May 1, 1998,** a brief statement of plaintiffs' economic dam-

---

**2.** Ford also asserts that driver error cannot be ruled out as a cause for this accident because Mr. Jones did not set the parking brake, for which he received an infraction notice from the District of Columbia Metropolitan Police Department. However, a car would not have slipped into powered reverse, even when the driver failed to set the parking brake, absent some defect.

ages, including medical expenses to date and other economic loss data. Further, counsel for both parties are directed to meet and confer prior to May 13th solely for the purpose of discussing settlement and reaching any possible stipulations with respect to damages.

IT IS SO ORDERED.